[Crim. No. 23714. July 22, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT GREGORY SMITH, Defendant and Appellant.

**COUNSEL**

Robert Viefhaus, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert M. Foster, Keith I. Motley and Robert B. Shaw, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**LUCAS, J.**—The principal issue presented by this case is whether the trial judge improperly denied defendant's motions for continuance. Defendant asserts that (1) he had insufficient time to examine California Jury Instructions, Criminal (CALJIC), and (2) he had not had the opportunity for eight hours of sleep the night before trial.

### I. FACTS

On January 17, 1982, at approximately 8 p.m., Gregory Leverich was playing cards in his home in Fullerton when he heard the sound of breaking glass. He opened his front door and saw a man enter through a window of the Smart & Final store across the street. While Leverich's wife telephoned the police, Leverich watched the man crawl out of the window, grab a bundle from inside the building, run across the street, and drive off in a six- or seven-year-old red Camaro. Although Leverich did not see the man's face, he was able to describe his clothes and car to the police. In a matter of minutes, an officer of the Fullerton Police Department stopped defendant, who was driving a red Camaro matching Leverich's description, five or six blocks from the Smart & Final store. Leverich identified the car and driver at the scene of defendant's arrest. During the few minutes that passed between the time the police stopped defendant and Leverich's field identification, the police officers engaged defendant in general conversation. Defendant carried no identification and gave an improbable explanation for his presence. He then stated, "You got me. What more do you want?" In plain view in the car was a box containing 30 cartons of cigarettes later determined to have been stolen from the Smart & Final store. Defendant had been released on parole less than two weeks earlier.

### II. PROCEDURE

What ought to have been a simple prosecution for burglary (a violation of Pen. Code, § 459) tested the patience of a number of superior court judges before a verdict was finally returned. To fully appreciate the heroic responses of these trial judges to defendant's tactics, it is necessary to detail the procedural aspects of this case.

Defendant appeared in court three times represented by the public defender, but two weeks before trial, and two and a half months after his first court appearance, he requested that the entire public defender's office be relieved. After inquiring as to the reasons for that request, Judge Dickey denied the motion. Defendant then requested that his trial be postponed for several months while he attempted to obtain money from his father to retain private counsel. He explained his delay in requesting such action by saying that he did not realize the seriousness of the charges pending against him. Judge Dickey, after a long colloquy with defendant, put the request over for several days and asked the public defender to contact both defendant's parents to determine whether retaining private counsel would be possible.

At the next hearing, defendant *again* requested more time to obtain private counsel or to represent himself, and Judge Dickey again continued the matter for one week, until June 1, 1982. At the June 1 hearing, one week before the scheduled trial, the public defender filed an affidavit under Code of Civil Procedure section 170.6 disqualifying Judge Dickey. The case was reassigned to Judge Fitzgerald who first faced defendant on June 7, 1982, the date scheduled for trial. By this time, defendant admitted that his chances for obtaining private counsel were small and the court trailed the matter for a day to allow defendant even more time to reflect upon his request for in propria persona (pro. per.) status.

At the hearing on June 8, 1982, when defendant renewed his request to proceed in pro. per., Judge Fitzgerald entered into an extended colloquy with defendant aimed at discovering whether defendant appreciated the seriousness of the crime charged against him, whether he understood the consequences of appearing in pro. per., and whether his decision was voluntary. Upon being satisfied, Judge Fitzgerald granted defendant's motion as required under *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525], and reset the trial date. The public defender, in open court, gave defendant his case files, discovery motion, and a "pro. per. package."

In the five months that elapsed between that June 8 hearing and trial, defendant appeared before Judge Fitzgerald ten times. During these appearances defendant moved (1) for the appointment of a private investigator, (2) to submit handwritten motions, (3) for additional pretrial discovery, (4) for more pencils, (5) to have a legal research firm appointed, (6) for the appointment of a "runner," and (7) to continue the trial date for 91 days. Judge Fitzgerald denied the motions for additional discovery and for the appointment of a legal research firm and refused, after having continued the trial date twice, to continue it for an additional 91 days. Otherwise, the court granted defendant's motions. The court also held, at defendant's request, an *in camera* proceeding and a full length evidentiary hearing both

aimed at resolving defendant's claim that he was being denied access to law books.

At last, defendant was brought to trial on November 8, 1982. At trial, defendant requested continuances on the grounds that he was too tired to proceed and that he had not had the opportunity to examine CALJIC. The trial judge, Judge Lee, after lengthy discussions with defendant and the prosecutor, denied those motions. Voir dire consumed about half a day, the trial itself took a day, and the jury returned a guilty verdict in less than an hour and a half.

At defendant's sentencing hearing, he moved to continue the proceedings until he had studied the probation report, and moved to call as a witness the probation officer who had prepared the report. Both motions were denied and defendant was sentenced to the upper base term of three years with a one-year enhancement for a prior felony.

### III. MAJOR CONTENTIONS

Defendant raises two issues for our consideration.

A. ■ *Access to Legal Materials.* About three weeks before trial, defendant moved to continue the trial date on the ground that he had not had adequate access to law books. He had first raised the question of access to legal materials a month earlier when the court denied his motion for the appointment of a legal research firm. Defendant claims that his lack of access to law books prevented him from preparing a defense and denied him due process. As the record makes markedly clear, however, defendant had access to a law library, including CALJIC; due process does not require more.

We note that defendant had been using the jail law library and the Orange County law library almost daily for three months before raising this issue. During those three months, defendant appeared in court at least five times. Defendant's actions suggest that he delayed raising this issue until it appeared that his trial was at hand.

After defendant moved to continue the trial date, Judge Fitzgerald, in an admirable display of concern for the possible limitations placed on defendant, held an evidentiary hearing and an *in camera* proceeding to determine defendant's access to legal materials.

Those hearings, reflected in some 46 pages of transcript, featured the testimony of 3 sheriff's deputies called by defendant and numerous exhibits

such as lists of books and book request slips. The stack of defendant's request slips for books he actually received was approximately three inches high. The testimony showed that books circulated from the jail library several times a day and that a deputy made a daily run to the Orange County law library. Defendant requested approximately two or three books per day, five days a week from the time he first assumed pro. per. status. Defendant could copy any noncirculating book through his "runner."

Defendant, *in camera,* requested the judge to subpoena certain inmates who resided near defendant's cell to testify as to the availability of books. He also sought the testimony of lawyers: "The Defendant: I plan to call a couple of attorneys, any attorney, that's in the building that day and a couple of district attorneys, any district attorneys that are in the building that day and the reason why I want two of each of them is because I want one that specializes in trial and I want one that specializes in research on both attorneys for defense and district attorneys. And I'm going to ask them if they could pursue their cases with diligence and competency without the assets of . . . a CALJIC fourth edition with supplements." Defendant also stated that he would need CALJIC "for at least 30 days before I went to trial, access to it for three or four hours a day . . .," to which the judge responded that the average attorney "probably doesn't spend more than 15 minutes on jury instructions." Finally, defendant requested the court to convene in the jail library to view the conditions there. The judge denied those requests.

At the conclusion of the hearing and *in camera* proceeding, the judge specifically found that the library facilities were fully available to defendant either through the daily runs or his runner and, more particularly, that defendant had access to all law books necessary to any defense.

*Faretta* simply requires that a pro. per. defendant be given the same treatment as an attorney. The judge here made that clear at defendant's *Faretta* hearing:

"The Court: You understand that during the course of a trial, if you represent yourself, you have to conduct yourself as a lawyer by all the standards of a person who is schooled in the law? [¶] The Court does not have a responsibility to school you in the law . . . .

"The defendant: In general, it's just cut and dry, if I just wanted to go pro per just for the sake of representing myself, because I think that I can, at my best, I think I can do a better job than my public defender at his best."

In fact, defendant was specifically aware of the difficulties in obtaining law books at his *Faretta* hearing:

"Mr. Smith: . . . [S]ometimes there's problems in getting law books from the Orange County Law Library insofar as rules of jury trials, because the law library at the County jail is a little bit incomplete . . . . [¶] It's pretty good for motions and as far as that . . . ."

Defendant does not assert that he was treated any differently from an attorney. The materials he requested but did not receive were either checked out or did not circulate. Defendant's mother was appointed as his "runner" to photocopy noncirculating materials from the county law library. Defendant had exactly the same access to all materials as any member of the bar or the public and never claimed that he had been forbidden to obtain or copy *any* book. Neither *Faretta,* nor any case we have found, requires more.

At the end of his trial, defendant renewed his motion to continue based on inadequate access to books. Specifically, defendant claimed that he had not had an opportunity to examine CALJIC and so had not had a chance to prepare jury instructions. The trial ended sooner than the prosecutor expected, because defendant did not cross-examine any prosecution witnesses and did not call any witnesses of his own. For that reason, a two-hour recess was called while the prosecutor finished preparing her jury instructions. When court reconvened, defendant and Judge Lee first saw the proposed jury instructions. The judge loaned defendant his copy of CALJIC and proceeded to consider the instructions. The court refused certain instructions and made modifications in other proposed instructions. At no time did defendant object to, or question the propriety of, particular instructions, or suggest additional ones.

As the court found at the elaborate hearing, defendant had access to CALJIC through his runner from the moment he assumed pro. per. status. Defendant himself admitted in open court six weeks before trial that he knew of CALJIC's existence and that he desired to use it. Defendant knew that CALJIC did not circulate (and would have to be photocopied) no later than three weeks before trial. Defendant's claim that he was denied access to CALJIC is simply without foundation.

Even if we were to accept defendant's contention that he was denied the opportunity to examine CALJIC until the conference on jury instructions, he has not shown any prejudice to his case. The trial judge did not simply accept the instructions proffered by the prosecution. Instead, he independently evaluated the proposed instructions, modifying or refusing almost one-quarter of those proposed. During this process, which took place on the record, defendant had a copy of the proposed instructions. The charge against defendant was quite simple and straightforward. Defendant pre-

sented no witnesses nor did he suggest or present any defense. Accordingly, the trial judge did not need to consider or craft instructions that would accurately instruct the jury on any defenses. Significantly, defendant is unable to point to any error in the instructions as given, nor does he assert that, had he studied CALJIC, he would have proposed proper instructions that were not given. In sum, the trial judge's instructions were complete and appropriate in light of the simple nature of the charges and the overwhelming evidence of defendant's guilt.

B. ■ *Lack of Opportunity for Sleep.* On the morning of trial, defendant requested a continuance on the ground that he had not been allowed eight hours of sleep and was too tired to present a case. He asserts that the trial judge erred by refusing to hold a hearing as to whether he had the opportunity for eight hours of sleep and that his due process rights were violated because he could not adequately defend himself due to lack of sleep. Defendant's position is unsupported both factually and legally.

Factually, the record reflects that defendant was attentive, lucid, and articulate throughout his trial. He renewed, at some length, his motion for continuance based upon denial of access to law books and registered other desultory complaints about his treatment, all before the veniremen were present. Defendant also presented a lengthy argument in which he asserted that the law required the opportunity for eight hours of sleep. Defendant fully participated in voir dire, exercising five peremptory challenges and stipulating to the exclusion of two other veniremen for cause. Although Judge Lee refused to hold a separate hearing on the morning of trial, he entered an order requiring the sheriff's department to allow defendant the opportunity for eight hours of sleep. Judge Lee also asked the prosecutor to investigate and report on the opportunity for sleep given to Orange County jail inmates the night before court appearances. She did so. Her oral report, although hearsay, was that defendant was given the opportunity for approximately seven hours of sleep.

The flavor of the proceedings is captured by this exchange:

"The Court: Mr. Smith, would you like to make an opening statement?

"Mr. Smith: No.

"The Court: There was [a] cough, and I didn't hear the defendant's answer.

"Mr. Smith: I'm too tired." After the prosecution's direct examination of its first witness defendant declined to cross-examine. The trial judge, in

what can only be considered an act of supererogation, offered *five* times to have the witness return the next day for cross-examination. The defendant's responses were argumentative and nonresponsive but in no way support his allegation that he was too tired to proceed.[1] After the prosecution's second witness testified on direct examination the following exchange took place:

"The Court: Mr. Smith, do you have any questions?

"Mr. Smith: Do you want me to tell you some more about my constitutional rights?

"The Court: I'm going to give you plenty of time to talk about your constitutional rights when the jury isn't here.

---

[1]"Ms. Brough: I have nothing further.

"The Court: You may ask him questions, Mr. Smith.

"Mr. Smith: No, Your Honor, I have been telling you, you denied me my right to defend myself. Carry on your charade here.

"The Court: Mr. Smith, if you request it, I would order the witness to return in the morning if you want to do so.

"Mr. Smith: I don't have a private investigator. I already told you that. What am I supposed to do?

"The Court: I'm giving you an opportunity—

"Mr. Smith: No.

"The Court: —to have him come back if you would like.

"Mr. Smith: How am I supposed to find out anything? I don't have a private investigator. I have not been able to investigate this case properly. I tried to tell you that before you called in the jury. You said, 'No. We are taking you to jury trial. No. Denied.'

"The Court: There are lots of things that have gone on in this case, but you just answer my question. Do you want the witness back in the morning for examination?

"Mr. Smith: Well, maybe if I got a pencil, I might be able to figure out something. I don't even have a pencil. I can't defend myself. You have denied my right to defend myself.

"Ms. Brough: I object to the defendant making statements of that kind in front of the jury.

"The Court: Your objection is well taken. [¶] Mr. Smith, these are problems that the Court takes up outside the presence of the jury, as we did earlier today, and you have had many discussions with me and other judges, and if you have any questions you want to take up, or you want to make statements like that about how you think you have been prejudiced, why, the Court will listen to you, at least within limits. But this is not the sort of thing that the jury should hear, because the jury is here solely to decide whether you are guilty or not, and not whether or not your complaints, whatever they may be, are well taken.

"Mr. Smith: Well—

"The Court: If you want, I have offered to have the witness come back in the morning for any questions that you would like to ask him.

"Mr. Smith: How can I know—we can go around and around like this, Your Honor, and unless you want to just take it and make sure, because I want to make sure that the record shows clearly that I believe that I have been denied my right—

"Ms. Brough: I object to the defendant making statements in front of the jury on those issues.

"The Court: The Court is asking you not to make any more statements of that kind in front of the jury [¶] Do you want the witness back in the morning, or do you not?

"Mr. Smith: I'm not going to answer that. I can't—I don't know. I can't know.

"The Court: Thank you, sir. [¶] You may step down. You are excused."

"Mr. Smith: That's all I'm going to talk to you about.

"The Court: Do you want to ask any questions?

"Mr. Smith: You don't want me to tell you some more about my constitutional rights.

"The Court: The witness may step down."

The next morning, when trial continued, defendant moved to replace the investigator that had been appointed for him and again complained about his lack of sleep. Specifically, he claimed that he had gotten more than five, but less than six hours of sleep. Defendant also requested the court to call seven other prisoners as witnesses to the fact that inmates were being denied the opportunity for eight hours of sleep. Those motions were denied. Defendant again refused to cross-examine the final prosecution witness. When the prosecution rested, defendant moved to subpoena an inmate from San Quentin. The court noted that the request was untimely and denied it. Defendant presented a rambling closing statement in which he admitted making the statement, "You got me, what more do you want?" and characterized that as a confession.

Defendant points to his failure to cross-examine and failure to present a defense as evidence that he was too tired to conduct his case. Given an eyewitness identification, defendant's arrest in the getaway car with the stolen property, and his own admission that he made an incriminating statement (which he himself characterized as a confession), we must conclude that defendant failed to present a defense because none was available. The record abundantly reflects that defendant fully participated in the proceedings to the extent he desired.

Defendant at trial relied on *Stewart* v. *Gates* (C.D.Cal. 1978) 450 F.Supp. 583 (remanded (9th Cir.) 618 F.2d 117), and *Rutherford* v. *Pitchess* (C.D.Cal. 1978) 457 F.Supp. 104. Both cases involved challenges to certain jail conditions (*Stewart* involved the Orange County jail, where defendant was held) and resulted in orders requiring, among other things, that prisoners be given the opportunity for eight hours of sleep before court appearances. Neither case required the trial judge here to hold a hearing or to suspend trial. No evidence suggests that Orange County jail officials were deliberately flouting the orders in *Stewart*. The concern of the district judge in both *Stewart* and *Rutherford* was not with affording prisoners the opportunity for eight hours of sleep, but ensuring that no defendant "is so worn out . . . that he lacks the alertness to help his attorney or to try to 'put his best foot forward' in the presence of the trier of fact." (*Rutherford, supra,*

457 F.Supp. at p. 114.) It is clear that defendant was awake, capable of participating in the proceedings and that he did so. Accordingly, the trial judge did not err in denying defendant's motion for a continuance.

## IV. OTHER CONTENTIONS

Defendant raises a raft of other issues, none of which has merit. We briefly discuss each issue.

A. *Marsden Hearing.* Defendant asserts that the court failed to inquire sufficiently into his reasons for wishing to have the public defender relieved and that such failure violates *People* v. *Marsden* (1970) 2 Cal.3d 118, 123-124 [84 Cal.Rptr. 156, 465 P.2d 44]. In *People* v. *Carr* (1972) 8 Cal.3d 287 [104 Cal.Rptr. 705, 502 P.2d 513], we held that the decision to allow a substitution of attorney is within the discretion of the trial judge "unless there is a sufficient showing that the defendant's right to the assistance of counsel would be substantially impaired if his present request was denied. [Citations.]" (8 Cal.3d at p. 299.)

At a pretrial hearing, defendant informed the judge that "[T]here is a conflict between myself and the public defender's office. I would have declared it before except I didn't think this charge was that serious . . . . [¶] I would like to be appointed an attorney not affiliated with the public defender's office in any way." Defendant then launched a discussion of whether he would be able to retain private counsel. The trial judge inquired, "As far as the conflict of interest is concerned, Mr. Smith, you haven't stated any reasons. It is not enough just to say that it is a conflict of interest or there is a conflict between you." Defendant indicated that he had been dissatisfied with the performance of another public defender in a prior case. That public defender appeared as cocounsel at defendant's preliminary hearing, but did not appear as his counsel in any subsequent proceedings. Defendant then rambled on about extraneous matters until the court inquired as to defendant's objection to his *present* public defender. Defendant simply stated "I don't want anybody with the public defender's office on my case because of [the former public defender]."

The trial court repeatedly asked defendant to articulate concrete reasons for his dissatisfaction with his present public defender or the public defender's office as a whole. Defendant's only reason was his dissatisfaction with his former public defender who apparently was not assigned to this case. Such a reason is not sufficient and the trial judge committed no error in denying the motion, particularly because, as the judge noted, defendant was aware that the public defender had represented him approximately two months before he made the motion to replace his counsel.

B. *Faretta Hearing.* Building on his assertion that the court improperly denied his *Marsden, supra,* 2 Cal.3d 118, right, defendant claims that his choice was between representing himself or accepting representation from counsel who should have been relieved. Thus defendant argues that his waiver was not voluntary as required under *Faretta, supra,* 422 U.S. 806. As set forth above, the trial judge's ruling on the *Marsden* issue was correct. Accordingly each of the alternatives facing defendant was proper. Defendant does not claim that the *Faretta* hearing was improperly conducted, simply that the alternative to waiving his right to counsel was impermissible under *Marsden.* As noted above, the *Marsden* argument is not persuasive and his *Faretta* argument fails for the same reason.

C. *Appointment of Experts.* Defendant cites two instances of the judge's refusal to appoint an expert and argues that those refusals were abuses of discretion. Defendant bases his claims of error on Evidence Code section 730 which provides in relevant part, "When it appears to the court, . . . that expert evidence is or may be required . . . the court . . . may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert . . . relative to the fact or matter as to which such expert evidence is or may be required." First, defendant moved for the appointment of a legal research firm to assist him in preparing his legal arguments, which request the court properly denied. As we noted in *People* v. *Redmond* (1969) 71 Cal.2d 745, 758 [79 Cal.Rptr. 529, 457 P.2d 321]: "[A defendant] is not entitled to special privileges not given an attorney, and the judge ordinarily is not required to assist or advise him on matters of law, evidence or trial practice. [Citations.]" Further, it is clear from the language of Evidence Code section 730 that a legal research firm would not be an expert. Section 730 speaks to the situation where expert *evidence* is or may be required and where the expert may testify regarding such evidence. No amount of legal research would produce *evidence*—that is, "testimony, writings, material objects, or other things presented to the senses that are offered to prove the existence or nonexistence of a fact." (Evid. Code, § 140.) Accordingly, defendant's reliance on Evidence Code section 730 is misplaced.

Second, defendant claims that the court abused its discretion when it refused to replace the court-appointed investigator. Defendant first moved for the appointment of an investigator some six months after his arrest. The first investigator declined to serve and the court then appointed Harry Block in late September 1982. At a hearing on October 1, 1982, defendant stated "[T]here's a *possible* conflict between myself and the private investigator. *If I declare a conflict of interest,* I'll state the reasons [at a hearing to be held in two weeks]." (Italics added.) Defendant did not mention this matter at that subsequent hearing but raised the issue again at a hearing on October

22, 1982, before Judge Fitzgerald, two and a half weeks before trial and a month after Block's appointment.[2] Defendant never filed a written motion to replace Block.

Defendant alleged *during trial* that Block had been working for the district attorney, and that Block had worked in defendant's neighborhood "approximately ten years ago." The court refused to hold a hearing and denied a motion for a mistrial. Only during trial did defendant assert that Block knew defendant's family. These allegations at trial, apparently intended to persuade a judge who was unfamiliar with defendant's tactics, did not succeed.

Defendant's reliance on Evidence Code section 730 is again misplaced for the reason that Block would not have been able to testify competently to any facts. More to the point, the court appointed an investigator as soon as defendant requested one. Defendant never flatly requested a replacement for Block until trial, well over six weeks after Block's appointment and more than a month after defendant indicated that he knew Block might be unacceptable. Such conduct precludes a finding of error.

D. *Refusal to Subpoena Witnesses.* Defendant claims that the trial court violated his constitutional right to compel witnesses for his defense. As a related matter, defendant seems to assign as error the court's failure to hold evidentiary hearings on defendant's requests for witnesses. ■ As the Court of Appeal stated in *People* v. *Fernandez* (1963) 222 Cal.App.2d 760 [35 Cal.Rptr. 370]: "Obviously, the right to subpoena witnesses which is given to every defendant by the Constitution and laws of this state [citations] does not authorize the indiscriminate use of the process of the court to call witnesses whose testimony could not possibly be received or which is grossly cumulative . . . . Anyone who has had anything to do with the adminis-

---

[2]This exchange took place:

"Mr. Smith: [A]lso you've appointed a certain private investigator by the name of Harry Block and that private investigator, like most private investigators, is an ex-police officer, but it just so happens that Harry Block used to patrol the same area that I lived in and at the time that he was patrolling that area—

"The Court: You don't want Mr. Block anymore as your investigator?

"Mr. Smith: That's right, your honor.

"The Court: Who do you want?

"Mr. Smith: I haven't had time to look into it. I've been too busy compiling my [book request] slips.

"The Court: Until you've made a request for substitution in writing, Mr. Block will continue to be your investigator . . . .

"Mr. Smith: . . . I would keep him up until the point—

"The Court: Fine. You have him as long as you want him.

"Mr. Smith: —up to the point where he has to go in and interview witnesses in my neighborhood, because that might prove to be a disaster for everybody because he has arrested people in the neighborhood where I grew up in and in the neighborhood where he patrolled."

tration of criminal law knows that defendants occasionally express a wish to call many witnesses from all parts of the state who cannot possibly add a single relevant fact to the complex of factors applying to the crime charged; the courts do have inherent power to control the issuance of their own process and they should not permit an abuse of the constitutional right to subpoena witnesses. . . ." (222 Cal.App.2d at pp. 768-769.)

Defendant attempted to secure witnesses on at least three occasions. First, during the hearing on his access to law books, he sought to subpoena "Anthony Amato AKA Johnny Apollo, who is housed in the same [jail] area as me. [¶] [O]r generally anybody that's in the same area as me, but somebody in the same area." The judge properly denied the request, after conducting the *in camera* hearing, on the ground that the witnesses would not add testimony relevant to the issue of defendant's access to law books.

Second, defendant *during trial* sought to compel the testimony of any one of seven fellow inmates on the issue of the opportunity for sleep. The judge, noting that trial was underway, denied the motion. None of these witnesses could have testified to any matter relevant to the burglary with which defendant was charged. As the judge acted properly in denying defendant's motion based on lack of opportunity for sleep (see, *ante,* pp. 953-956), he was within his discretion in refusing to subpoena those inmates.

Finally, on the morning of trial, when asked by the trial judge whether he admitted or denied the allegation of a prior conviction, defendant replied that he wished to subpoena a San Quentin inmate named Carlos Negron: "As soon as I interview him, I will be able to ascertain whether or not to plead guilty or not plead guilty to the prior. [¶] Also I need that particular witness for the purposes of a defense." Despite numerous and substantial contacts with with the criminal justice system,[3] a knowledge for eight months of the very simple charges against him, and the demonstrated ability to articulate his desires in court, defendant's first mention of this witness or indeed, any competent witness, came on the morning of his trial. Defendant explained his failure to seek Negron's subpoena earlier by stating "That is because I could hardly believe that I was going to be denied my [*Faretta*] rights, because I have access to hardly no books at all." The court denied the request on the grounds that it was untimely and that defendant had made no showing, or even a suggestion, that Negron's testimony would be relevant. The judge also refused defendant's request for an *in camera* hearing on Negron's possible testimony. Defendant's renewed request for Negron, made after the prosecution's case-in-chief, was likewise denied.

---

[3]Before his arrest on this matter, defendant had been arrested 20 times in the prior 5 years, and had been convicted of 7 misdemeanors and 1 felony (second degree burglary). At the time of his arrest, defendant was 24 years old.

The trial judge was well within his discretion. ■ Penal Code section 2621 specifically gives discretion to the court to grant or deny a subpoena for a witness who is a prisoner outside the county of trial. Untimeliness is a valid reason for exercising that discretion against issuing a subpoena. (*People* v. *Dillinger* (1968) 268 Cal.App.2d 140 [73 Cal.Rptr. 720].)

■ E. *Sufficiency of the Evidence.* Defendant claims that the evidence is insufficient to support the verdict. Defendant's contention is without merit in light of the facts previously discussed (see, *ante,* pp. 948-950).

F. *Motion for a New Trial.* At his sentencing, approximately one month after the verdict, defendant stated that he desired a two-month continuance to make a motion for a new trial. The trial judge again indulged a tirade in which defendant canvassed the arguments and complaints he had been making throughout his incarceration. The trial judge denied defendant's motion for a lengthy continuance and stated that "[T]o the extent that the defendant's remarks are consistent for a motion for new trial, the Court denies that motion." Under Penal Code section 1181, the burden is on the defendant to move for a new trial. Defendant filed no written motion or notice of motion but simply informed the court at his sentencing hearing that he wanted to make such a motion. He did not specify the grounds upon which he sought a new trial.

If defendant's statements at his sentencing are considered to be a request for a continuance in order to move for a new trial, the trial judge properly denied that request. This hearing was held about four weeks after trial and defendant did not present any valid reason why he had not previously submitted a motion for a new trial, or requested a postponement of his sentencing. To the extent that defendant's assertions were considered by the judge as a motion for a new trial, he was correct in finding that no new arguments were raised, and that all defendant's arguments had been considered and resolved against him. Therefore, no ground for a new trial existed and no error appears from the judge's actions.

G. *Request to Cross-examine Probation Officer.* Defendant, at his sentencing, requested that the court call as a witness the probation officer who prepared the probation report. ■ Defendant has no right to cross-examine such a witness for the reasons stated in *People* v. *Arbuckle* (1978) 22 Cal.3d 749 [150 Cal.Rptr. 778, 587 P.2d 220, 3 A.L.R.4th 1171]. The reasoning behind *Arbuckle* was that, although a defendant is not precluded from presenting any affirmative evidence of his own, neither the Sixth Amendment nor the Penal Code requires that he be permitted to cross-examine the person who, pursuant to statutory mandate, prepares a proba-

tion report. Accordingly, the trial judge did not err and defendant's argument is without merit.

H. *Dual Use of Prior Prison Term.* Defendant contends that the sentencing judge used his prior felony prison term both to enhance his sentence and to impose the upper term, a violation of Penal Code section 1170, subdivision (b). The record reflects that the sentencing judge and the prosecutor discussed enhancement and aggravation and that, when pronouncing sentence, the judge carefully avoided using the prior prison felony as a fact in aggravation when imposing the upper term. In any event, the record reflects other factors in aggravation (such as planning and sophistication) and no factors in mitigation, so that a remand for resentencing would not benefit the defendant.

## V. CONCLUSION

This case presents a classic example of a street-wise defendant doing everything possible to delay his conviction and to induce error into every phase of the proceeding. It is a credit to the various judges involved that they showed such deference, consideration, and courtesy to this defendant. Despite his best efforts, defendant was unable to prevent his conviction and no ground appears for reversal.

The judgment is affirmed.

Mosk, J., Kaus, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

**BIRD, C. J.**—I respectfully dissent. Justice Crosby wrote a most persuasive opinion in the Court of Appeal which I adopt as my own:*

Robert Gregory Smith represented himself and was convicted of burglary with a prior burglary conviction in a jury trial which amounted to little more than an extended plea of guilty.

### I.

Smith raises several issues on appeal. The simplest is the attack on the sufficiency of the evidence.

About 8 p.m. on January 17, 1982, Gregory Leverich opened the front door of his Fullerton residence when he heard sounds of breaking glass.

---

*Brackets together, in this manner [], without enclosing material, are used to indicate deletions from the opinion of the Court of Appeal.

Hanging from the window of a wholesale grocery directly across the street was Smith, paroled only a few days earlier for second degree burglary.[1] While his wife phoned police, Leverich followed Smith to the only car in the parking lot, losing sight of him momentarily, before the car left the scene.

A short time later, Fullerton officers stopped Smith's vehicle based on Leverich's description. In plain view on the rear seat was half a case of cigarettes missing from the store. Leverich was brought to the scene and identified Smith, as he did later at the preliminary hearing and trial.

Smith suggests Leverich's identification was based on assumptions the person who drove out of the parking lot was the burglar and the person caught in the car was the one who drove out of the lot. Nothing in the record supports these notions, however. There was no cross-examination of Leverich. Even if Smith's speculation had been confirmed, the trial jury would have undoubtedly drawn the same conclusion Leverich is accused of doing. Smith offers no hypothetical explanation for his rather incriminating recent and contemporaneous possession of the vehicle used in the burglary and the loot. The evidence was more than sufficient.

## II.

Experienced in the ways of the criminal justice system and undeterred by the powerful case against him, Smith trotted out a series of procedural obstacles to the efficient disposition of the matter in the trial court. The more he did, however, the worse his position became.

He first invoked his right to object to his court-appointed attorney and request a substitution. (*People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]; *People* v. *Minor* (1980) 104 Cal.App.3d 194 [163 Cal.Rptr. 501].) Next, when that motion was denied, he elected to represent himself (*Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525]); and the court made appropriate orders for law books, supplies, an investigator, and legal runner.

Here he complains the court did not sufficiently inquire into his motion to disqualify the public defender's office. The court did enough. It indulged Smith's rambling attack on the office largely based on his dissatisfaction with the deputy who handled his preliminary hearing, but she was not assigned to his case in the superior court. He also claimed the public defender

---

[1]The jury learned about the prior because Smith did not admit it or seek to bifurcate the trial. (See *People* v. *Bracamonte* (1981) 119 Cal.App.3d 644 [174 Cal.Rptr. 191].) []

wanted to "dump" his case from the beginning, but he offered nothing of substance to support that allegation. If the motion had any basis at all, it appears likely Smith merely confused a deputy's realistic appraisal of his chances at trial with a lack of enthusiasm for Smith or his case. There was no reason to relieve counsel. (Cf. *People* v. *Hill* (1983) 148 Cal.App.3d 744 [196 Cal.Rptr. 382].)

Smith also attacks the granting of his motion to represent himself. He claims he was forced to that decision because his motion to relieve the public defender's office was improperly denied. Not so. As we explained, given ample opportunity, Smith made an inadequate record to support disqualification of the public defender; and the court offered a reasonable continuance to secure private counsel. When Smith insisted on self-representation, the court made certain his choice was voluntarily and intelligently made. (*Ferrel* v. *Superior Court* (1978) 20 Cal.3d 888, 891 [144 Cal.Rptr. 610, 576 P.2d 93].) The court explained the dangers of self-representation and warned he would be held to the same standards as an attorney; but a "knowledgeable" Smith insisted on his *Faretta* rights. The court had no choice but to grant the motion. (*People* v. *Joseph* (1983) 34 Cal.3d 936, 943 [196 Cal.Rptr. 339, 671 P.2d 843].)

## III.

Court appearances in the months preceding trial and the trial itself were largely given over to Smith's complaints concerning his pro. per. status. A simple burglary case turned into a vexing lawsuit over jail conditions, Smith's legal runners, requested witnesses and legal experts, his evening repose, pencils, law books, and so on. Smith appeared to enjoy tweaking the system; and we sympathize with the judges who, for the most part, patiently dealt with his often petty gripes.

If that were his aim, Smith did get the better of the judges in the end, however; for we must reverse his conviction despite the strength of the evidence. There are two reasons.

First, during the two-day trial, Smith, complaining of lack of sleep, made little effort to defend himself. He did not cross-examine or present witnesses and made but a brief closing argument, mostly relating to matters not supported by the record and to complaints about his treatment in court. Each day he said he was tired and demanded a continuance because he had been allowed insufficient sleep. The court refused to allow him to present evi-

dence of the fact. We set out the gist of these discussions at length in the margin.[2]

---

[2]Before jury selection commenced, the following colloquy occurred:

"MR. SMITH: I would just like to tell you, Your Honor, that I'm not getting eight hours sleep, and there is a federal court order against denying prisoners who are going to trial eight hours sleep. [¶] I was woken up [sic] at 3:30 this morning, and I have not gotten my eight hours sleep, and there is a federal court order by Judge Gray from the Central District prohibiting the Orange County Sheriff from doing that; and the sheriff blatently [sic] disregarded that court order, woke me up at 3:30 in the morning, thus denying me eight hours sleep. [¶] I am supposed to defend myself on three hours sleep. I can't do it, Your Honor.

"THE COURT: Ms. Brough, isn't there in existence an order relating to the subject of the amount of sleep that a defendant is entitled to have?

"MR. SMITH: A federal court order.

"Ms. BROUGH: I don't believe there is such an order in this particular case.

". . . . . . . . . . . . . . . . .

"MR. SMITH: The door was not—I was given a shower last night at about twenty minutes after ten, 10:30. I got out of the shower, and the shower door is right next to the dayroom door, and after I got out of the shower, the shower door opened, I stepped out, the dayroom door opened, and I was told to move in. [¶] Then at about 11:30 I went back to my cell. Then at 3:30 I was woken up [sic].

"THE COURT: Would you inquire during the noon hour whether or not the practice is now to wake prisoners up at 3:30? If it is, I will make a separate order for purposes of this case.

"Ms. BROUGH: Thank you, Your Honor. I will.

"THE COURT: All right. [¶] Are there any other preliminary matters?

"MR. SMITH: Just I have been denied the right to defend myself, and I haven't even gotten my sleep. I can no longer defend myself like that.

"THE COURT: You have expressed yourself on the record.

"MR. SMITH: I would like to—if you would like, Your Honor, you can ask anybody in this room how much sleep they got last night.

"THE COURT: The jury will be ready but not brought up at 1:45. At 1:45 perhaps you can report on this problem of the sleep.

"Ms. BROUGH: I will." That afternoon Smith's complaints were discussed again:

"MR. SMITH: Your Honor, there is a federal court order. It is even in the books, Stewart vs. Gates. The jail isn't complying with that court order. [¶] I was very surprised when they came to my cell at 3:30 in the morning and woke me up. About 20 minutes later they are rattling my gate telling me to come out. [¶] Your Honor, I want to take as fact that if the officer wouldn't have rushed me out of my cell, I would have been ready right now with a motion to challenge the jury selection in this county. Because of that, I'm not prepared, because I got rushed out of my cell after getting only three hours sleep.

"THE COURT: Ms. Brough, the Court asked you to make inquiry over the noon hour into the subject. What did you learn?

"Ms. BROUGH: I spoke with Sergeant Keller over at the jail. He indicated that the usual time to awaken the prisoners is between 4:30 and 5:00 a.m., and that as far as he knew no one was awakened at 3:30.

"MR. SMITH: Your Honor, you want to bring over a couple of inmates that are—well, let's see. [One inmate] is in [another] court right now. And you want to bring over [another]? He is over at the jail right now. We can bring in witnesses all day long on this, and they will—you like to take it for a fact that we were in fact woken up at 3:30 this morning, and I did leave my cell no later than four o'clock in the morning, and did enter the chow hall at a little after four o'clock in the morning and waited in the fourth floor another couple hours.

"THE COURT: I'm going to make an order in the matter without inquiring further into the matter. [¶] The Court orders that the officials of the jail, sofar [sic] as the hours, that Mr. Smith is to have the opportunity to sleep and comply fully in all respects with the order of Judge William Gray in 450 Federal Supplement 583. [¶] The clerk will make a separate

The court really had no option other than to take evidence to determine the merits of the claim Smith was too tired to go forward, as both he and

---

minute order of that order and make a copy of it which will be given to the transportation deputy, and he will take it to the watch commander.

"MR. SMITH: So now, Your Honor, the question remains now, I have been denied sleep last night and this morning. I don't know. I can't even think clear right now, because I'm really tired. [¶] I have been forced in, you know, conducting a voir dire without any help of, you know, without the benefit of looking at any kind of books that have anything to do with that, and without the benefit of eight hours sleep. [¶] Like I said, Your Honor, I was gotten up at 3:30 this morning, and if you didn't want to call over any witnesses to testify about that, then, I would like that taken as the fact.

"THE COURT: The motion for continuance was already denied both by me and by another judge this morning. So we will continue with the selection of the jury.

"MR. SMITH: Well, Your Honor, you could continue it for one day. I didn't have my eight hours sleep. I already told you that. You were well aware of that fact before the jury came in.

"THE COURT: Court is in recess."

After the recess the jury selection continued. Later, the same afternoon, the judge again addressed Smith:

"THE COURT: Mr. Smith, would you like to make an opening statement?

"MR. SMITH: No.

"THE COURT: There was a cough, and I didn't hear the defendant's answer.

"MR. SMITH: I'm too tired."

The following day was more of the same:

"MR. SMITH: Okay. [¶] Now—Your Honor, the Court—or the jail and sheriffs are not complying with the federal court order. I was woken up [sic] at ten minutes to four o'clock this morning. I have a copy here of Stewart vs. Gates about what the judge has to say about getting up at 3:30 in the morning. And ten minutes to four is twenty minutes later than 3:30 in the morning, and last night I got about a little over five hours sleep. And right now I'm real tired again. I'm about to go to sleep. I can't think straight. Right now I'm emotionally poor—motioning for continuance until I get eight hours sleep before and after trial date, just like the federal court order says right here, because you just made that order yesterday that the jail was supposed to comply with all court orders made by William Gray in the Central District of the Federal Court here in California. [¶] Would you like to read what it says here, Your Honor, about getting eight hours sleep the night before and eight hours sleep the night after trial dates? That is what it says right here. [¶] I didn't get no eight hours sleep last night. I'm tired.

"THE COURT: It sounds like a motion for continuance. Would you like to respond?

"MS. BROUGH: Your Honor, People, of course, are opposed to that motion right in the middle of the trial. I don't know what time the lights go out in the jail, but if Mr. Smith wants to continue his case until he gets eight hours sleep, and we are going to base that on his statement without any type of corroboration and not under oath, I don't think we would ever go to trial in this case. [¶] I oppose a continuance. The trial is in progress. I ask that we go ahead and complete the trial.

"MR. SMITH: Your Honor, [an inmate witness] is in front of [another judge] this morning, and he is in tank 14, module C, which is the tank right above mine. And I'm housed in tank 13. [¶] If you would like to bring him down here so he may give oral testimony to add weight to my statement and enter his testimony as evidence into the record, you can call him over here, since he is in the courtroom right now. [¶] If you would like to call inmates over from the Orange County Jail from tank 14 and tank 13, which is my tank, they will testify to the same thing, Your Honor, that at approximately ten minutes to four in the morning an officer was yelling on the microphone, 'Wake up, get up, stand up for count, be in full jail issue,' and was racking the gate as the lights came on. [¶] If you are not willing to issue an order to bring them in here, those particular inmates [lists names of seven

the prosecutor suggested, or to accept his representation and grant daily continuances when he had not been allowed adequate sleep. Instead, it apparently accepted the representation but proceeded anyway with a vague allusion to reconsidering the subject on a motion for new trial.

[] [T]he right to self-representation is meaningless to a somnambulant prisoner attempting to act as his own attorney. Thus, because Smith was improperly denied the opportunity to prove the fact, the essentially uncontroverted record is he was too tired to defend himself; and the conviction must be reversed for failure to grant the continuance requested.[4] (*People* v. *Hill, supra,* 148 Cal.App.3d 744, 757.)

---

prisoners] who is up there.

"Ms. Brough: Your Honor, if I may just briefly respond, I think that is another attempt by the defendant for a delay tactic in his trial. So far we have heard reasons that the trial should not proceed because of pencils, erasers, inadequate access to books, the fact that his mother was his runner, and she is an older person, the fact that he needed a witness from San Quentin and who he decided he needed yesterday. [¶] Now apparently he is raising this issue of inadequate sleep and some problem with an investigator. [¶] I think when you see a pattern like this, it is apparent what is going on. He doesn't want to go to trial. And I don't think that he should be allowed to manipulate the Court into that kind of a situation just by bringing up a large number of excuses.

"Mr. Smith: Your Honor, I am not at this time asking for a long continuance. I'm just asking that the sheriff complies with your court order and the federal court order, which encompasses Orange County, of getting eight hours sleep the night before, the night after. I will be ready to proceed tomorrow if the sheriff complies with the court order of the federal court.

"The Court: I'm ready to rule. The Court denies the motion. [¶] There is a jury impaneled. The case is a very short one and should be concluded today. [¶] In the event that there is occasion shown by way of a motion for new trial or vacating any verdict that may be entered in this case, the Court will consider it. *The Court does not think that this is an appropriate case to enter into any kind of inquiry as to whether on* [sic] *not the jail has complied* either with Judge Gray's order or *with this Court's order.* So we will proceed with the trial. [Italics added.]

"Mr. Smith: Then, Your Honor, since you refuse to bring those inmates over, I would just like it taken as a fact that we did get up at ten minutes to four this morning, I only got a little over five hours sleep last night, less than six hours, but a little over five hours sleep last night.

"The Court: I heard your statement."

Later, after the arresting officer was called on direct, Smith was invited to cross-examine:

"The Court: You may cross examine, Mr. Smith.

"Mr. Smith: As I told you yesterday, and you can take it as fact this morning, Your Honor, that you are denying me everything. I'm too tired to cross examine him. The transcript is right here. I can show where he lied, about the transcript where he placed me under arrest, when he arrested me for Vehicle Code Section.

"The Court: You have an opportunity given to you to cross examine, not to make a speech to the Court. Do you desire to cross examine?

"Mr. Smith: You have totally restricted me from defending myself, Your Honor.

"The Court: The Court takes that answer as negative, then. You may step down, Officer."

[4]We do not consider whether to remand for a belated evidentiary hearing on the merits of Smith's allegations concerning sleep because the next issue requires reversal in any event.

The basis for our holding was aptly expressed in *Javor* v. *United States* (9th Cir. 1984) 724 F.2d 831: "Today we conclude that when an attorney for a criminal defendant sleeps through a substantial portion of the trial, such conduct is inherently prejudicial and thus no separate showing of prejudice is necessary. See *Holloway* v. *Arkansas,* 435 U.S. 475, 489-91, 98 S.Ct. 1173, 1181-82, 55 L.Ed.2d 426 (1978); cf. *Rinker* v. *County of Napa,* 724 F.2d 1352 at 1354 (9th Cir. 1983) (per curiam). [¶] Javor's sixth amendment right to counsel was violated not because of specific legal errors or omissions indicating incompetence, but because he had *no* legal assistance during a substantial portion of his trial. The magistrate's finding of no actual prejudice is not controlling because regardless of counsel's participation when present, when a defendant is tried in the partial absence of counsel, he is prejudiced as a matter of law. *Id.* [¶] Prejudice is inherent in this case because unconscious or sleeping counsel is equivalent to no counsel at all. The mere physical presence of an attorney does not fulfill the sixth amendment entitlement to the assistance of counsel, . . ." (*Javor* v. *United States, supra,* 724 F.2d at pp. 833-834.) The rule has even greater application to a self-represented prisoner; for if the actions of the jailer have impaired his right to defend himself, the individual has not just suffered a deprivation of constitutional dimension, the state itself is responsible.[5]

## IV.

The second basis for reversal relates to the inadequacy of the time and legal materials provided Smith to prepare and discuss jury instructions. During a strange pretrial hearing in which Smith was required to reveal, *in camera,*[6] his reasons for wishing to subpoena a particular inmate witness, Smith complained of his inability to obtain a copy of California Jury Instructions (CALJIC) from the jail law library. The court made this unfortunate reply:

"THE COURT: You're concerned about something that is so insignificant in preparing for a trial. The average attorney probably doesn't spend more than 15 minutes on jury instructions.[7] The court has the responsibility to give all law on the case that bears on the issues of the trial. So whether or not you're conversant with what instructions should be given is not really

---

[5]Moreover, apart from its obligation to Smith, the court had a responsibility to itself and the administration of justice. It should have given Smith the opportunity to prove his allegations, not only to consider the motion for a continuance, but also to enforce compliance by the sheriff.

[6]Although the prosecutor was absent, two sheriff's deputies were present, another of the uneasy compromises occasioned by *Faretta, supra,* 422 U.S. 806.

[7]The sad accuracy of this observation cannot be doubted. It is a major reason so many cases, civil and criminal, founder on appellate shoals.

relevant to your defense for the reason that the court will be giving all applicable law. And there's no reason for you to have to study a CALJIC in detail, or most of the other books that you've asked for, in the court's mind, and there's no reason for you to spend your state prison term in county jail, if that's what's going to happen to you. [¶] The other observation I made is that even though the People are very interested in giving you the maximum, the court is inclined to give you some consideration, if you're interested in a plea in the case. I told you earlier that I would give you three years and I want you to think about that. If, before we actually start the trial in this matter, if it's still before me, you decide you want to plead guilty, I'll keep that offer open to you; three years instead of the maximum."[8]

Then, in trial before a second judge, the prosecutor rested sooner than anticipated because of Smith's refusal or inability to participate in the proceedings. She needed a two-hour recess to collect her proposed jury instructions.[9] Smith was provided those instructions and the court's copy of CALJIC about 1:15 p.m., and the jury was ordered back at 1:30. Thus, Smith approximately received the 15 minutes prophetically suggested in the *in camera* hearing to examine the prosecution's proposed instructions and CALJIC.[10]

---

[8]We withhold comment on the propriety of the latter portion of this statement in an ex parte proceeding. Smith *did* receive the maximum punishment but from a different judge.

[9]A properly prepared prosecutor, particularly prosecuting a pro. per., should provide the proposed instructions much earlier in the proceedings.

[10]The proceedings went like this:
"THE COURT: Bailiff, will you ask the jurors to remain outside until we complete this portion of the proceedings. [¶] Now, the deputy district attorney has submitted a plaintiff's request for jury instructions. I have caused those instructions that have been requested to be xeroxed. [¶] Mr. Smith, I understand you have requested no instructions specifically.
"MR. SMITH: Well, Your Honor—
"THE COURT: Just answer yes or no so I can get on with it.
"MR. SMITH: I don't have access to any of the CALJIC, California Jury Instructions.
"THE COURT: All right.
"MR. SMITH: I haven't had no opportunity to ever see them.
"THE COURT: Bailiff, will you hand the defendant the two copies of CALJIC and the two supplements. [¶] Now, I xeroxed the copy of the instructions that the district attorney has recommended. Do you have the two copies, Miss Clerk?
"THE CLERK: I have one of the copies. The district attorney has her copy.
"THE COURT: All right. [¶] Will the bailiff please hand to the defendant the copy that I have had made of the requested instructions by the district attorney. This is in order to simplify the Court's decision as to which instructions to give."
A few minutes later Smith stated, "Well, Your Honor, what are you going to do with my motion for continuance until I have time to look at the California Jury Instructions and look up the case law?
"THE COURT: Your remark is out of order."
After going through each instruction without comment from Smith, the judge said, "Now, that concludes the advice that the Court is required under the law to give to counsel as to

Consequently, we must find a second interference with Smith's Sixth Amendment right to represent himself. We have no way of knowing what, if anything, might have happened differently had Smith been allowed a reasonable opportunity to prepare his own instructions and study those presented by the prosecution. That is, of course, the grave difficulty with Sixth Amendment violations; the harm is generally impossible to assess. (*Barber* v. *Municipal Court* (1979) 24 Cal.3d 742, 756-757 [157 Cal.Rptr. 658, 598 P.2d 818]; *Javor* v. *United States, supra,* 724 F.2d 831.)

Even if we could affirm on the ground the errors were harmless beyond a reasonable doubt because of the overwhelming strength of the prosecution case, it would not be appropriate to do so for the same reason Smith was entitled to adequate representation in the first place. The right to counsel flows from the federal and state Constitutions and has nothing to do with the relative strength of the prosecution case. To paraphrase a golden oldie of the law, a defendant with a hard case is just as much entitled to adequate representation as anyone else and much more in need of it. Interference with that right is virtually the equivalent of the denial of the trial itself; neither is subject to meaningful evaluation after the fact. (*People* v. *Joseph, supra,* 34 Cal.3d 936, 945-948.) Smith is entitled to a new trial.

[]

---

the instructions to be given.
"MR. SMITH: Your Honor.
"THE COURT: Yes, if there is something you want to say, say it briefly.
"MR. SMITH: Yeah. [¶] This is the first time that I ever been able to get the Cal Jury Instructions with additions for criminal flat [*sic*]. I just told you right now there is no way that I can be ready with any jury instructions that I request in just a few minutes that you have given me. Besides that, the matter of not getting enough sleep.
"THE COURT: The Court will now state what the verdicts will be."

# In Memoriam

## HONORABLE MARSHALL F. McCOMB

Judge of the Superior Court of Los Angeles County, 1927-1937
Associate Justice of the Court of Appeal, Second Appellate District, Division Two, 1937-1956;
Associate Justice of the Supreme Court of the State of California 1956-1977.

---

The Supreme Court of California met in its courtroom, Paramount Plaza Building, Los Angeles, California, November 6, 1981.

Present: Chief Justice Bird, presiding; Associate Justices Tobriner, Mosk, Richardson, Newman, Kaus and Broussard. Gill, Clerk; Williams and Rogers, Bailiffs.

CHIEF JUSTICE BIRD: We meet this morning to pay tribute to the memory of Marshall F. McComb, who served as an Associate Justice of the California Supreme Court from 1956 until 1977. On behalf of the court, I wish to welcome Justice McComb's widow and his daughter, Martha Mullin and the friends of the family. Justice Frank Richardson will speak on behalf of the court.

ASSOCIATE JUSTICE RICHARDSON: Thank you, Madam Chief Justice. The court pauses today in its Los Angeles calendar to note with sadness the passing of our colleague, Marshall Francis McComb, the 80th member of our court. While the occasion is one of sorrow at the state's loss of a distinguished citizen, in reflecting upon his days among us we sense that here was a life fully and richly lived. Justice McComb was born in Denver, Colorado, the son of a mining father, who moved with his family in the 19th century successively to San Diego and then to Los Angeles. It is fitting that we should be expressing this tribute to him today, here in Los Angeles, because his roots were here. It is here that he lived his earlier years attending the Olive Street Grammar School, Manuel Arts High School, and the University of Southern California Preparatory School. After graduating from Stanford, Justice McComb served his country during World War I in the United States Navy attaining the rank of Lieutenant Commander. Following receipt of his law degree, cum laude, from the Yale Law School, he began the general practice of law here in Los Angeles.

Upon his appointment to the Los Angeles Superior Court in 1927, he began a judicial career which spanned more than a half century. His fellow jurists chose Justice McComb as presiding judge of that distinguished court and he devised the Master Calendar Plan which was widely credited with containing the then growing and heavy volume of litigation. The people of Los Angeles County reelected him twice.

His judicial skills were recognized in 1937 when he was appointed to the Court of Appeal for the Second District in Los Angeles. Then in 1956 he was called to our court and served on it from 1956 to 1977 becoming its senior member. Justice McComb was a devoted colleague who was always loyal to the court. His many opinions for the court over more than 20 years were uniformly crisp, spare, lean and to the point. His reasoning and conclusions were very well defined. His philosophy was one of restraint. There was no doubt where he stood on the critical issues which came before the court during his long tenure on it. He held the strong, independent and self-reliant views of the typical Westerner.

Beyond his contributions to California law, there was a quality in the character of Justice McComb which was revealed to all of those who observed him—that was his essential humanity. He had profound respect for people not only in the aggregate, but for people as individuals, as persons. He valued them as friends regardless of their station or their means. He related to them at their own level and they, in turn, responded to him. He was people oriented and was organizationally related.

His fraternal and association ties were numerous and diverse and he held high office in many groups. To mention any of his affiliations is to ignore many others, but his service in the Navy during World War I and his status as a war veteran were sources of considerable pride to him. He was proud of our flag and for many years wore a small emblem of the flag on his coat lapel. Both nationally as Vice President of the Navy League and locally as a charter member of Los Angeles Post No. 8, American Legion, he demonstrated his strong interest in veterans' affairs.

He was very approachable and several members of his staff have recently recalled that during his busiest and most active years those with personal problems frequently sought the benefit of his experience and wisdom. We who served with him were constantly aware of his personal warmth and radiating kindness which were generated deep within the heart of the man whose impulses were generous. He gave of himself and of his substance to good causes in full measure. To a university library which has been named for him, to a major hospital on the governing board of which he served for many years, and the countless social, religious and charitable enterprises of many kinds, Justice McComb truly left a rich heritage. In the more than 20 years of his service on this court, while expressing both strong and honest views, he demonstrated a gentility of spirit, a generosity of outlook, and an acceptance of life which gave him an inner peace. Now that he is gone we can preserve only in memory his twinkling eye, his erect carriage, his unfailing courtesy, his gentlemanly manner, his humor and his kindness. As friends and colleagues, we cherish our association with him. We honor and respect his loyal service to the people of this state.

We extend to his widow, Margherite, and to all of his family our sincere sympathy in their loss. We share with them also our deep appreciation and that of the bench and the bar and the people of California for his life and for the many years of faithful service which Justice McComb gave to our judicial system.

CHIEF JUSTICE BIRD: Thank you, Justice Richardson, for those eloquent words. We will now turn to Justice Mildred Lillie, a long time friend of Justice McComb, who will speak next.

JUSTICE LILLIE: Madam Chief Justice and Associate Justices, may it please the court. We are here in remembrance and it is my pleasure to join with Justice Richardson in this splendid tribute to Justice McComb. The memory of Marshall Francis McComb will long live in the annals of California judicial history and in the hearts of those whose lives he touched.

His service to the people of the state and to the administration of justice began with his appointment to the Superior Court of Los Angeles County in October, 1927. Prior to his judicial career which spanned a period of over 50 years, he had been engaged in general practice. One of his most prestigious clients was The Hearst Corporation. His friendship with members of the family and the senior officers of the corporation he kept intact all of his life.

Marshall McComb was 33 years old when he became a superior court judge. He had a remarkable administrative ability of which few of us were aware or remember, and some senior lawyers will never forget. The youngest of 38 superior court judges and early in his judicial career, he was assigned to preside in the civil calendar department. In those days, as today, the court was bedeviled with an insurmountable backlog of civil cases. Marshall McComb resolved to clear up that backlog and he did just that, and in a surprisingly short time, through perseverance and his stern approach to lawyers who had fallen into dilatory practices. First he cut a swath through the backlog and then he designed the Master Calendar System. At first the mortality rate was high; lawyers who were not prepared for trial or whose clients or witnesses were not in court found their cases summarily dismissed, and staggered out of the courtroom in the old red courthouse not quite knowing what had happened to them. And he did all of this with unfailing courtesy, always the gentleman. He restored the court to its normal routine and reduced the time from initiation of the lawsuit to trial to six to eight months, a far cry from the present day struggle to set causes for trial within the five-year period. Even in those days, it was a very dramatic accomplishment; he had devised a system that would enable our courts to deal satisfactorily with the ever increasing flow of civil cases. He won the admiration of the bar, that is after the lawyers involved had recovered from their shock, and his Master Calendar System became the subject of numerous articles in national publications. In only a short time, he made a worthy national

reputation for himself. And that accomplishment reflects his philosophy of getting on with it and getting the job done. Perhaps it is the same philosophy that inspired his short, concise opinions. Pithy, but to the point and covering all issues, the format used by him in both the Court of Appeal and the Supreme Court generally assumed the Socratic method. He stated the question and then answered it. Once, I asked him the secret of producing a short, adequate opinion; with tongue in cheek, he answered "You will find that as you grow older you will have less and less to say." But somehow it hasn't worked out too well for me. His economy of words accounts too, for his disinclination to ask questions from the bench, and it generally characterized his personal communication with others. He wasted little time on unproductive conversation.

Marshall McComb valued countless persons in friendship. They came from everywhere, from every walk of life. Friendship was important to him; and he maintained his friendships and old ties throughout his judicial life without compromising his role as a judge. Those he befriended supplied him with a great variety of interests and often brought to him a greater variety of problems and concerns—to them he gave freely of his time and his personal advice. His great capacity for friendship touched my life too. My first contact came through my late husband who in the early 1940's had started through the chairs in Elks Lodge 99, later to become exalted ruler, largely through the encouragement of Marshall McComb. He was a kind and generous mentor, and lavish with his time, his means, his wisdom and his experience. He long will be remembered for his fierce love of country and devotion to the preservation of its traditions and institutions. His opinions, majority and concurring and dissenting alike, reflect his philosophy of judicial restraint and his solid conviction that the community and the victim are as much entitled to the protection of the law as the perpetrator of the crime. At times he was devastatingly outspoken and there was never any doubt about his views on any given issue. He was an independent thinker and he had the courage and the strength of heart and spirit to stand alone in his convictions. His love of country and devotion to the principles and ideals that made it strong were reflected in his own personal life. At every turn he extolled the virtues of this great nation as though he himself, in the early days, had helped fashion the Republic with John Adams, Thomas Jefferson, and Benjamin Franklin, the generators of our democratic form of government. He never tired of voicing his pride in the system of which he was a part. Through his life, judicial career, accomplishments and contributions to the administration of justice, he left a rich and loving legacy to his family. He lives deep in the hearts and memories of his beloved widow, three daughters, grandchildren and great grandchildren. And through his legal opinions he will continue to live as long as there are readers of case law.

Thank you.

CHIEF JUSTICE BIRD: Thank you, Justice Lillie. We now will turn to Dean Leigh Taylor of Southwestern University School of Law, who is a friend of the McComb family.

MR. TAYLOR: Madam Chief Justice and Associate Justices. May it please the court.

"He . . . proved again the simple secret that a great judge must be a great man. He must have a full sense of the seamless web of life, a grasp of the endless tradition from which we cannot escape. He must be capable of stern logic and yet refuse to sacrifice to logic the hopes and fears and wants of men. He must be able to catch a glimpse of the ultimate in the immediate, of the universal in the particular. He must be statesman as well as jurist, thinker as well as lawyer. What he is doing is to shape the categories through which life must flow, and he must have a constant sense of the greatness of his task. He must know the hearts of men and yet ask to be judged from the conscience of their minds. He must have a constant sense of essential power, and yet be capable of humility in its exercise. He must be the servant of justice and not its master, the conscience of the community and not of its dominant interests. He has to put aside the ambition which drives the politician to search for power and the thinker to a construction of an abstract system. No one must be more aware of the limitations of his material, none more hesitant about his personal conviction. The great judge is perhaps the rarest of human types, for in being supremely himself, he must yet be supremely selfless. He has to strive towards results he cannot control through material he has not chosen. He has to be in the great world and yet aloof from it, to observe and to examine without seeking to influence."[1]

This observation was made by Harold Laski in 1931, in which he described that supreme fellowship which reaches back to the endless past in which men have sought a place for plan and order in human affairs. Gaius, Ulpian, Mansfield, d'Agnesseau, Marshall, Savigny, Maitland, and Holmes. I believe that they would surely welcome the company of Justice Marshall Francis McComb.

As a lawyer and a teacher of law, I feel especially privileged to be able to participate in this tribute to the memory of Justice McComb, who dedicated his life's work to the law and to the judiciary in the State of California. When we reflect that his 50 years of service as a judge contrasts with only 200 years of American law, we can begin to appreciate the true significance of his contributions to our legal institutions, our profession and society.

As Justice Richardson and Justice Lillie have noted, Justice McComb was appointed to the Superior Court of Los Angeles County in 1927, and as Presiding

---

[1] Mr. Justice Holmes (F. Frankfurter ed. 1931) pages 139-140.

Judge of that court will be remembered for his creative and energetic contributions to judicial reform in his work to improve the efficiency and effectiveness of that court. Justice McComb was appointed Associate Justice of the District Court of Appeal in 1937 and served on that court until his appointment to the Supreme Court by Governor Goodwin Knight in 1956. Governor Knight viewed his appointment of Justice McComb as one of his "proudest accomplishments."

During his years on the California Supreme Court Justice McComb would write 314 majority opinions, 77 concurring opinions, and 339 dissenting opinions. His concurring and dissenting opinions help to sharpen our analysis and our focus of those cases. His majority opinions were clear, lucid and succinct, and often years ahead of their time. If one attempts to analyze his opinions, contradictions seem to appear, for while Justice McComb could be characterized as a law and order judge, he applied his sense of obedience to the law to citizen and governmental official alike.

But more than a judge to whom we might attempt to fix labels, Justice McComb was always a servant of the law. His basic judicial philosophy might well be illustrated in his opinion in *In re Keddy*,[2] where he wrote, "No individual or public official is above, beyond or exempt from the mandates of the Constitutions, state and federal. If judicial officers do not abide by their solemn pledge to protect and defend the Constitution, as well as to observe the limitations prescribed thereby, we must expect from the average citizen only contempt for our most cherished institutions and legal concepts."

Justice McComb's opinions reflect this philosophy and demonstrate his deep concern for constitutional principles of separation of powers, his strong deference to the findings and conclusions of trial judges and his deep commitment to insuring greater protection of the public from crime. These strong convictions, which would cause him to be regarded as a strict constructionist, were tempered by similar concerns with constitutional limitations on governmental access which were reflected in numerous other opinions.

Throughout his life, Justice McComb remained a student of the law. For years he shared his knowledge with students at UCLA, Loyola and Southwestern. He was always interested in the observations of people whose vantage points were different from his. He truly enjoyed all people, but especially the relatively young, uneducated, and unaccomplished. Whether it was as a student, teacher, lawyer, public servant or jurist, Marshall McComb spent his life listening and learning.

---

[2] (1951) 105 Cal.App.2d 215, 220 [233 P.2d 159, 162].

His contributions to the judiciary were acknowledged by two Presidents. In 1973 President Richard M. Nixon wrote, "For more than half a century, Justice McComb has been a bright star in California's constellation of distinguished attorneys. He has graced the bench with an enlightened judgment and stabilizing influence. I well remember his brilliant effectiveness as an appellate court judge when I practiced law in Southern California. Since then he has immeasurably enriched his enduring contribution both to the body of California law and to the strength of American jurisprudence." Following Justice McComb's death, President Ronald Reagan wrote in his final tribute, "Marshall McComb's philosophy and legal opinions will stand for eternity as exemplars of judicial restraint and discipline for which I shall forever respect him."

As significant as these presidential memorials are, Justice McComb is remembered finally by his colleagues and friends as a man who was courteous to everyone, proud, patriotic, and gentlemanly, amiable, agreeable and civil, articulate and positive in his thinking, kind and encouraging, and a man who never said an unkind word about anyone. Never took himself too seriously, and was amusing, good company, and pleasant to be with, quite simply a warm and giving friend. Could there be a finer tribute?

Our profession is a strong and noble one and from it only a select few are chosen to administer our system of justice, and fewer still to sit in final judgment as members of this honorable court. The lawyer's task as advocate pales in light of the awesome role we assign the judiciary, with its responsibility for ensuring that the fragile fabric of our society continues to be held together by the twin threads of the role of law and the continuing quest for justice. It is quite understandable then, as Justice Cardozo would comment, that the task of judging is one to baffle the wisdom of the wisest. Yet, too often we seek Solomonic decisions and correct opinions and lose sight of the greater importance of the legal process and the integrity of our judicial officers, factors which transcend the merits of any case.

Clearly, Justice McComb was a man of devotion, integrity and principle, a man with a total and abiding love for our concept of justice and equality under law. His lifetime commitment represents for all of us the finest example of professionalism and service. We could seek no finer qualities for ourselves, our children, or for the generations of law students, lawyers and judges yet to come.

At Southwestern University School of Law we will ensure that the Marshall McComb Senate of the Delta Theta Phi Legal Fraternity, the Marshall McComb Library and the Marshall McComb Scholarship Fund serve not only as fitting memorials, but also permit those generations to come to appreciate so worthy an exemplar. As Roger Grace wrote, "It is fitting that he be honored

and that a tribute thus be paid him by students who are seeking to join him as servants of the law. For there has been no more faithful servant and no more diligent servant than Justice Marshall McComb."[3]

While all of us are especially saddened by the loss of such a fine friend, a fine man, a fine teacher, and a fine judge, Justice Marshall Francis McComb's contributions to our profession and to society will endure, and I feel especially honored to be given the opportunity to express my appreciation to a man who gave us all so much.

Thank you.

CHIEF JUSTICE BIRD: Thank you, Dean Taylor. I thank all of the speakers here today for their remarks. In accordance with our custom, it is ordered that this memorial be spread in full upon the minutes of the court and published in the Official Reports, and that a copy of these proceedings be sent to his widow, Mrs. Marshall McComb. The court is adjourned.

---

[3] Grace, *Justice Marshall F. McComb: A Tribute* (1973) 5 Sw. U.L. Rev. 221.