[No. B004710. Second Dist., Div. Seven. Feb. 26, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL CHARLES DAVIS, Defendant and Appellant.

1178

1180

Counsel

Teri Schwartz, under appointment by the Court of Appeal, and Michael Charles Davis, in pro. per., for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Mark Alan Hart and Sharlene A. Honnaka, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

BARRERA, J.*—The defendant was convicted of first degree murder and robbery. He appeals from the judgment imposing a sentence of 25 years to life for the murder and 5 years for the robbery, the latter sentence being stayed in accordance with Penal Code section 654.[1] We affirm.

### The Facts

Thaddeus Pracki was strangled to death. When discovered in the hallway of his apartment, his nude body was face down, his head in a pillow, his wrists tied to his ankles behind his back. The 62-year-old victim had six broken ribs, four bite marks on his right arm and numerous bruises and abrasions. His wallet and credit cards were missing. There was no sign of forced entry. About 15 hours earlier, he had been with the defendant and others at Joly's, a homosexual bar.

One hour before the body was discovered, the defendant attempted to buy a pair of boots, his companion presenting the victim's American Express card for their purchase. The defendant used the victim's Texaco card two, three or four times, the defendant was not sure, within a few days of the crime. His fingerprint was lifted from a knife found at the crime scene and probably used to cut the lamp cord that bound the victim. He admitted to Aaron Scott, a friend, that he had killed an old gay guy that he and a friend took out of Joly's with the intent to rob.

The defendant testified that he set the victim up at Joly's with a "stud"

---

*Assigned by the Chairperson of the Judicial Council.

[1]The defendant was also convicted of grand theft (auto) but the count was dismissed when a motion for new trial was granted. The jury acquitted the defendant of three additional counts involving a second homicide. One enhancement, a violation of Penal Code section 12022.7, was found to be true in connection with the robbery but the court made no mention of it at the time of sentencing. The jury made no findings on the other enhancements, or on the probation proscriptions, alleged. It found none of the special circumstances alleged to be true.

named Shug but, after agreeing that the victim would pay Shug for the defendant's services in bringing the victim and Shug together, left them and went elsewhere, the following day Shug gave him the victim's Texaco card in payment, and the knife with his fingerprint was taken from a pot of knives at the scene of his arrest.[2]

I

### SUFFICIENCY OF THE EVIDENCE TO SUSTAIN FIRST DEGREE MURDER

█ The defendant contends that the evidence is insufficient to sustain the conviction for first degree murder. The jury was instructed on three theories of first degree murder, i.e., willful, deliberate and premeditated; in the perpetration or attempted perpetration of a robbery (felony murder), and by torture. Three special circumstances were alleged, i.e., murder in the commission or attempted commission of a robbery, murder by torture, and multiple murder convictions. None was found to be true. He infers that, by a process of elimination, the jury must have based its verdict on the theory of a willful, deliberate and premeditated killing. Since there was no evidence of prior planning activity, a motive to kill or a deliberate intention to kill, he argues, the evidence is insufficient to meet the test of *People v. Anderson* (1968) 70 Cal.2d 15, 26-27, 33-34 [73 Cal.Rptr. 550, 447 P.2d 942], and the conviction must be reversed or, at least, reduced to second degree murder.

We disagree. Murder in the commission or attempted commission of a robbery, as a special circumstance, may properly be found to be true only if the defendant intended to kill, or aid another in the killing of, a human being. (Pen. Code, § 190.2, subd. (a)(17)(i); *Carlos v. Superior Court* (1983) 35 Cal.3d 131, 153-154 [197 Cal.Rptr. 79, 672 P.2d 862].) Murder by torture, as a special circumstance, may properly be found to be true only if the murder was intentional. (Pen. Code, § 190.2, subd. (a)(18).) Both felony murder and murder by torture are first degree murder but do not require an intent to kill. (Pen. Code, § 189; *People v. Lookadoo* (1967) 66 Cal.2d 307, 314 [57 Cal.Rptr. 608, 425 P.2d 208]; *People v. Steger* (1976) 16 Cal.3d 539, 546 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206].) Under the facts, the jury might well have found that the killing occurred in the commission of a robbery, as a result of acts done with the willful, deliberate and premeditated intent to torture, i.e., to cause extreme and prolonged physical pain (*id.*, at p. 546), or both, but was not intentional. We need not consider, therefore, whether the evidence also supports a conviction for willful, deliberate and premeditated murder.

---

[2]Two witnesses testified that the lift of the print occurred within days of the murder and months before the defendant's arrest. Our attention was not called to any explanation for the American Express card or the incriminating statements to Aaron Scott.

## II

### FAILURE TO APPOINT COCOUNSEL

■ Davis maintains that he was denied due process and equal protection under the law, citing the Fourteenth Amendment of the United States Constitution and article I, section 7 of the California Constitution. He complains that two of the judges who presided over pretrial proceedings abused their discretion in denying him the right to represent himself *and* to have cocounsel. There is no onus on a trial court to exercise its discretion on the issue. A defendant who represents himself and, thereby, enjoys the full panoply of privileges which that status confers has no right to cocounsel. (*People* v. *Mattson* (1959) 51 Cal.2d 777, 789 [336 P.2d 937], cited with approval in *People* v. *Bigelow* (1984) 37 Cal.3d 731, 742 [209 Cal.Rptr. 328, 691 P.2d 994].) The defendant cites *Mattson* for the proposition that he was entitled to have judicial discretion exercised on the issue. In its dicta concerning the exercise of discretion, the state high court said: "We are not saying that the trial court may not in its discretion, upon what it may determine to be good cause shown, permit a party who is represented by counsel to participate in the conduct of the case . . . or permit a defendant who appears in propria persona to employ an attorney to sit by him and advise him during the presentation of the case in court, or even appoint an attorney (with the latter's consent) to render such advisory services to an indigent defendant who wishes to represent himself [citation]. These matters are within the sound discretion of the trial judge, who is in a position to appraise the courtroom situation and determine what procedure will best promote orderly, prompt and just disposition of the cause. The court, however, should not permit a litigant both to have counsel and to actively participate in the conduct of the case (as by conducting examination of witnesses, interposing objections, arguing points of law or of fact, addressing the jury, etc.) unless the court on a substantial showing determines that in the circumstances of the case the cause of justice will thereby be served and that the orderly and expeditious conduct of the court's business will not thereby be substantially hindered, hampered or delayed." (*People* v. *Mattson, supra,* 51 Cal.2d at p. 797.) It was addressing the ambit of limited participation which a trial court, in its discretion, may afford a defendant represented by counsel. Concerning a defendant representing himself, as is the case here, it speaks only of the services of advisory counsel. Davis was permitted to represent himself and to have cocounsel in the municipal court. He attempted to keep that status in the superior court. The first judge to entertain the request denied him cocounsel without prejudice. The second judge offered to appoint standby advisory counsel but also denied the defendant's request for cocounsel. The defendant refused the offer but, nonetheless, Mr. Wager, the attorney who represented the defendant in the municipal court and whom

the defendant sought to have appointed cocounsel, was appointed advisory counsel during jury selection, some 20 days before the jury was sworn. A defendant who represents himself has no absolute right to even advisory counsel. His sole right is to have the trial court exercise its sound discretion about whether, in light of all the circumstances, such an appointment best serves the interests of justice.[3] With Mr. Wager's appointment as advisory counsel, the defendant was afforded all that the law allows.

## III

### WAIVER OF COUNSEL

The defendant also argues that he did not voluntarily and intelligently waive his right to counsel but was rather coerced into acting as his own attorney. The argument is meritless. The first judge to deny the cocounsel request examined the defendant at length about his ability to represent himself. The defendant told the judge that he, the defendant, had finished high school, enrolled in junior college and training school courses, albeit he had dropped out, and represented himself, alone or with cocounsel, at his last two preliminary hearings. He was aware of the charges and their serious nature and understood the special circumstances against him. He knew how to do pretrial motions, properly conduct voir dire, make an opening statement, object to irrelevant evidence, meet the issue of impeachment by prior convictions, and present an argument. The judge indicated that the defendant had appeared before him once before and was very astute. The defendant told the judge, "I insists [sic][4] on my rights to participate in my case and I ask the court [to appoint cocounsel]." The judge found the defendant to be mentally competent, literate and fully informed of his right to counsel and to have made a voluntary, intelligent and understanding waiver of his right to be represented by counsel. He afforded the defendant pro. per. privileges.[5] (*Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525].) The defendant was, thereafter, given numerous opportunities to have counsel appointed if he gave up his right to represent himself. He was asked, "You are on in pro. per. status at the county jail, correct?" He answered, "Yes, your honor." He was then asked, "If you are in pro. per., that's what you want; right?" He answered, "Yes." Clearly, the defendant at all times insisted on his right to control the case however vigorously he

---

[3]Refusal to appoint advisory counsel in a capital case *may* itself be an abuse of discretion and reversible error per se. (*People* v. *Bigelow, supra,* 37 Cal.3d at pp. 743-745.)

[4]The defendant's speech patterns are idiomatic. No purpose is served by indicating further syntactical errors.

[5]Out-of-court privileges afforded to an incarcerated defendant appearing in propria persona, or "pro. per." (*Ferrel* v. *Superior Court* (1978) 20 Cal.3d 888, 890, fn. 2 [144 Cal.Rptr. 610, 576 P.2d 93].)

also sought the appointment of cocounsel. Trial courts are not required to engage in game playing with cunning defendants who would present Hobson's choices. If a defendant refuses to waive his right to counsel unequivocally but insists on pro. per. status with its attendant privileges, as this defendant did, a trial court may properly conclude that this, in itself, is a waiver of a defendant's right to counsel. ■ If he is meaningfully advised of the dangers and disadvantages of self-representation,[6] found to be literate, competent, understanding, and voluntarily exercising his informed will (*Faretta* v. *California, supra,* 422 U.S. at pp. 835-836 [45 L.Ed.2d at pp. 581-582]) and he persists in seeking or, as in this case, retaining pro. per. status, he may properly be afforded the privileges of self-representation and charged with the burdens of such representation as well, including the loss of counsel for other than advisory or standby services.

## IV

### DENIAL OF THE SECTION 995 MOTION

Davis urges reversal because his preliminary hearing was impermissibly interrupted in violation of Penal Code section 861 and the denial of his motion to dismiss, under Penal Code section 995, was, therefore, error. He contends that, having been granted pro. per. *and* cocounsel status, he was prepared to proceed without his cocounsel when, over his objection, the hearing was continued from April 11 to April 15, 1983, because his cocounsel's wife was ill. No citation to the record is made. We note, however, from an independent perusal, that on April 8, the matter was continued to April 15. There is no explanation for the hiatus. ■ We need not, however, address the issue because there is not even a contention, much less a showing, that he was denied a fair trial or otherwise prejudiced thereby. In a posttrial review, the absence of such a showing is fatal. (*People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519, 529-530 [165 Cal.Rptr. 851, 612 P.2d 941].)

## V

### WHEELER ERROR

■ ■ ■ ■ ■ The defendant also contends that he was denied his constitutional right to a trial by an impartial jury and complains of *Wheeler* error.[7] (*People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d

---

[6]See the discussion which follows under VI Access to Legal Materials, VII Lack of Sleep and IX Revocation of Pro. Per. Status.

[7]Actually, the defendant, himself, does not complain of this at all. As part of his request for leave to file a supplemental brief, he unequivocally declares, "The record will show that

748].) The defendant is Black. The two victims in the crimes with which he was charged were White. The prosecutor exercised 20 peremptory challenges in selecting the jury, 6 of which were exercised against Blacks.[8] Three Blacks were not challenged and were a part of the jury that delivered the verdicts.

 The prosecution may exercise a peremptory challenge for any reason it chooses until the exercise of such a challenge interferes with a defendant's constitutional right to an impartial jury drawn from a representative cross-section of the community. To assure that constitutional guarantee, no peremptory challenge may be exercised solely on the basis of group bias, i.e., because the challenged juror is a member of a cognizable group generally defined by sex, race or ethnic group. (See, e.g., *Duren* v. *Missouri* (1979) 439 U.S. 357 [58 L.Ed.2d 579, 99 S.Ct. 664] [women]; *People* v. *Wheeler, supra,* 22 Cal.3d 258 [Blacks]; *People* v. *Trevino* (1985) 39 Cal.3d 667 [217 Cal.Rptr. 652, 704 P.2d 719] [Hispanics]. But see also *Thiel* v. *Southern Pacific Co.* (1946) 328 U.S. 217 [90 L.Ed. 1181, 66 S.Ct. 984, 166 A.L.R. 1412] [wage earners].) Since no reason need be given for the exercise of such a challenge (Pen. Code, § 1069), challenges for group bias can rarely, if ever, be discerned until a pattern emerges which begins to indicate discriminatory exclusion. A defendant, who believes that constitutionally impermissible challenges have been made, may raise the issue by moving for a mistrial. (*People* v. *Wheeler, supra,* 22 Cal.3d at pp. 280-282.) In ruling on the motion, the trial court must first determine whether the pattern, however the defendant demonstrates it, (*id.,* at pp. 280-281) constitutes a prima facie showing of that pernicious practice. (*Batson* v. *Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 81, 106 S.Ct. 1712].) The defendant made four such motions addressing the six Blacks stricken from the prospective jury panel, but we have been unable to ascertain whether the trial court made such a determination.

In the first two, the prosecutor began to justify the exclusions immediately upon the making of the motions without giving the court an opportunity to find whether the defendant had demonstrated a prima facie case. In denying the motions, the court did not clearly indicate that it considered the issue.[9]

---

I had an impartial jury. 4 white 3 black 3 mexican 2 asian and that it [took] almost a month and a half to pick the jury. An[d] for Counsel to use 5 pages on a[n] issue that [has] no foundation show[s] that Counsel [is deliberately denying] me the right to an honest [a]ppeal." The Attorney General would have us adopt the comments of the defendant and consider the issue no further. Tempted as we are to follow that suggestion in resolving this rather difficult issue, we respectfully decline. The defendant's appellate counsel rightfully asserts that the responsibility for determining all questions of strategy and tactics is hers and hers alone. (*People* v. *Mattson, supra,* 51 Cal.2d at pp. 797-798.) We, therefore, adopt none of the defendant's comments except as they are independently supported by the record.

[8]He also exercised a challenge against the sole Black on the alternate panel.

[9]When the third Black, Mr. Springer, was challenged, the defendant began to complain that his right to an impartial jury was being impinged upon. The prosecutor àsked whether the

In the third, the court asked the prosecutor for justification immediately upon the making of the motion without ruling on the prima facie issue. Here the trial court came closest to an implied finding of a prima facie case[10] but we do not easily draw the inference because in the last motion, the court appeared to rule that *no* prima facie case was shown. In that last motion, however, it, nonetheless, immediately asked the prosecutor for his justification.[11] Our attention has not been called to, nor have we found, any

defendant was making a *Wheeler* motion and the defendant replied that he was. Without waiting for a ruling that the court found a prima facie case shown, the prosecutor began to justify the challenge. When the prosecutor finished, the court asked, "Do you have a comment with respect to Mrs. Cox?" The prosecutor replied that he didn't know whether he needed to say anything because "he [the defendant] passed it back then." Nonetheless, the prosecutor articulated reasons for challenging her. The court then stated, "The court doesn't find any effort to exclude a cross-section of the population. The court believes that the district attorney has spelled out his reasons for excusing the jurors, the two jurors discussed .... Let me just comment that the excuses, the reasons for the excuses, those reasons do appear to exist, if one wishes to adopt them. Mr. Longo [the prosecutor] has chosen to adopt them in order to excuse the jurors." The court then asked, "What about Mr. LeFridge? Do you have any comments?" The prosecutor stated, "Well, once again, I don't have my notes here. Those papers are all over there." He then asked, "Does the court want me to state the reason why I excused him?" The court answered, "Well, I don't think you are obliged to, under the circumstances. There was no challenge. There was no raising of the issue then. But I will let you put on the record whatever there is." The prosecutor then articulated what reasons he had. The court commented, "I don't believe that there is any effort to exclude the cross-section. The court finds the peremptories were properly exercised. The motion is denied."

When the fourth Black, Ms. Palmer, was challenged, the defendant moved for a mistrial. Again, without waiting for a finding that there was a prima facie case demonstrated, the prosecutor began to articulate his reasons for challenging her. The defendant noted that two Black prospective jurors remained in the box and the court added that there were ten or more beyond. The court then stated, "Well, a peremptory can be exercised for any reason. And the court believes that Mr. Longo has stated his reasons and they are proper grounds for the exercise of a peremptory. The court believes that under the law that's been expanded by the Supreme Court concerning voir dire, that ... [has] been considerably broadened in the last two years, the inquiries have been broadened, I mean, ... jurors' attitudes certainly can constitute a basis for exercising a peremptory challenge. The court denies the motion. The court finds there is no attempt to exclude a portion of the venire—of [a] segment of the venire on the grounds of race."

[10]When the fifth Black, Ms. Blakney, was excused, the defendant again moved for a mistrial. Without ruling on whether a prima facie case had been shown, the court asked, "Does the district attorney have any basis?" The prosecutor then articulated his reasons. The court observed, "It seems like a justifiable peremptory to me under the circumstances." The prosecutor added more reasons. The court concluded, "I don't think there is an intentional exclusion, or any exclusion, [of] any particular segment as such. The court takes it that the peremptory is well taken, and for the reasons that were stated by Mr. Longo. I [had] some questions about whether or not the law was meant to allow a peremptory on such grounds, but I think, quite properly, it can be utilized for that purpose, that is, the attitudes which were expressed by her concerning the death penalty can be utilized for a peremptory challenge. And it's more than you suggest Mr. Davis. I can recall that she was very strong in her opposition to the death penalty. So the motion is denied."

[11]When the sixth Black, Ms. Bailey, was challenged because she lived in Venice, adjacent to Marina Del Rey where one of the homicides occurred, and appeared to be afraid, the defendant made another *Wheeler* motion. He argued, more or less, that Venice has a high concentr-

place in the record where anyone used "prima facie case" or any similar term.[12] We begin our analysis, then, assuming an implied finding that the defendant made no prima facie showing of discriminatory exclusion and consider whether the finding is sustainable on appeal.

Under the Sixth Amendment to the United States Constitution and article I, section 16 of the California Constitution, the rationale for the *Wheeler* rule was found to be "that in our heterogeneous society jurors will inevitably belong to diverse and often overlapping groups . . . ; . . . it is unrealistic to expect jurors to be devoid of opinions, preconceptions, or even deep-rooted biases derived from their life experiences in such groups . . . and hence . . . the only practical way to achieve an overall impartiality is to encourage the representation of a variety of such groups on the jury so that the respective biases of their members, to the extent they are antagonistic, will tend to cancel each other out." (*People* v. *Wheeler, supra,* 22 Cal.3d at pp. 266-267.)[13]

Under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the rationale for a comparable federal rule was found to be, first, that a defendant has a right not to have members of his race excluded from the jury because of race or on the false assumption that members of his race as a group are not qualified to serve as jurors. Further, by denying a person participation in jury service because of his race, the state also unconstitutionally discriminates against the excluded juror. Finally, selection procedures that purposefully exclude Black persons (or, presum-

---

ation of Blacks and the striking of Ms. Bailey because she lived there was, in truth, a striking for group bias. The court commented, "The court doesn't detect any effort to eliminate a group of people from any particular area. But what is your explanation for your peremptory challenge to Mrs. Bailey?" The prosecutor articulated his reasons. The court asked the defendant, "You don't think it is justifiable when you believe a juror is afraid for her safety, to exercise a peremptory in those circumstances?" The defendant answered and the court concluded, "Well, her response was well, she was very well known there. The court believes that it is quite probable; . . . [the inference] is justifiable . . . that she might be influenced possibly by her attitude. The court finds no willful exclusion [of] any particular group or of any cross-section. Again, the court finds that the district attorney has spelled out an adequate reason for a peremptory challenge . . . so the motion is denied."

[12]When the sole Black on the alternate panel, Mr. McDade, was challenged, the defendant again moved for a mistrial. He made a short argument and the court asked, "Well, how many blacks have you got on the jury?" The prosecutor replied, "There are three." The court then asked, "What is your reason?" The prosecutor then articulated his reasons. The court then said, "Well, the motion is denied. The court doesn't find any exclusion of a group as such. But the court does find that it is a proper exercise of a peremptory." Although we do not reach the *Wheeler* issue on that challenge, we note that the court was no clearer there.

[13]Although not part of its analysis of the right to trial by an impartial jury, the high court did add, "[T]he representative cross-section rule also serves other essential functions in our society, such as legitimating the judgments of the courts, promoting citizen participation in government, and preventing further stigmatizing of minority groups" (*id.,* at p. 267, fn. 6), Justice Mosk not only anticipating the federal rule by eight years but its rationale as well.

ably, other members of cognizable groups; see *People* v. *Trevino, supra,* 39 Cal.3d 667) undermine public confidence in the fairness of our system of justice. (*Batson* v. *Kentucky, supra,* 476 U.S. at p. 87 [90 L.Ed.2d at pp. 80-81].)

While six Blacks were challenged, comprising 30 percent of the total peremptory challenges exercised by the prosecutor in selecting the jury, at no relevant time were there fewer than two Blacks in the jury box and the panel that delivered the verdicts contained three.[14] We take judicial notice of the federal census judicially noticed in *People* v. *Harris* (1984) 36 Cal.3d 36 at pages 47-48 [201 Cal.Rptr. 782, 679 P.2d 433]. (Evid Code, § 452, subds. (c) and (h).) The Black population of Los Angeles County in 1970 was 10.8 percent and in 1980 was 12.6 percent. We doubt that the figures were significantly different at the time of the trial in 1983. We note, therefore, that the percentage of Blacks on the prospective jury panel at all times exceeded, and of Blacks on the jury panel almost doubled, the percentage of Blacks in the general populace of the county.

The presence of two and then three members of the cognizable group in the jury box at all times afforded the defendant a representative cross-section of the community and afforded equal protection to all, the defendant, the prospective jurors excused and the community at large. There was no prima facie case of exclusion for group bias demonstrated at any time. (*People* v. *Boyd* (1985) 167 Cal.App.3d 36, 48-50 [212 Cal.Rptr. 873].)

If, on the other hand, the trial court impliedly found, however erroneously, that the defendant demonstrated a prima facie case of discriminatory exclusion, may we disturb the finding on appeal? The prosecution is clearly precluded from direct appeal. (Pen. Code, § 1238.) In the defendant's appeal, however, the Attorney General may request that an appellate court pass on trial court errors adverse to the prosecution in order to secure the affirmance of a judgment of conviction. (Pen. Code, § 1252; *People* v. *Braeseke* (1979) 25 Cal.3d 691, 698-701 [159 Cal.Rptr. 684, 602 P.2d 384] vacated 446 U.S. 932 [64 L.Ed.2d 784, 100 S.Ct. 2147], on remand 28 Cal.3d 86 [168 Cal.Rptr. 603, 618 P.2d 149]; *People* v. *Singh* (1934) 1 Cal.App.2d 729, 730 [37 P.2d 481].) Although the issue was addressed,[15] the Attorney

---

[14]At the time of the first *Wheeler* motion, Mr. Guillory and Ms. Briscoe, both Blacks, were in the jury box and were later joined by Ms. Dai're, also a Black. All three were a part of the deliberating jury.

[15]After first asking us to adopt the defendant's concession that he had an impartial jury, which we declined to do (see fn. 7, *ante*), the Attorney General argued: "If this Court requires corroboration of appellant's claim that his jury was impartial, the record provides such support. When appellant made his final motion based upon *People* v. *Wheeler, supra,* the motion came during voir dire of the alternates. At that point, the prosecutor noted, without

General made no such request, which is understandable, there having been no express finding of a prima facie case. We conclude, therefore, that if the trial court did impliedly make such a finding as to Ms. Cox, Mr. LeFridge, Ms. Blakney and Ms. Bailey by asking the prosecutor for justification (*People v. Turner* (1986) 42 Cal.3d 711, 719 [230 Cal.Rptr. 656]), we may not disturb it. Further, as to Mr. Springer and Ms. Palmer, the prosecutor may have, however unnecessarily, conceded the issue by proffering justification without waiting for the court to rule on the prima facie issue. ■ We turn, therefore, to an examination of the prosecutor's reasons for excluding the Black prospective jurors seeking to determine whether the court's rulings of adequate justification are also sustainable on appeal.

Ms. Bailey, Ms. Cox, Ms. Palmer and Ms. Blakney were excused because they either vacillated or were hesitant in answering questions concerning their qualifications to sit on a capital case. (*People v. Turner* (1984) 37 Cal.3d 302, 313-315 [208 Cal.Rptr. 196, 690 P.2d 669].) Ms. Bailey was excused, as well, because she lived in Venice, California, which is adjacent to Marina Del Rey where the homicide, of which the defendant was acquitted, occurred and she was afraid. Mr. Springer was excused because of "histrionics," explained by the prosecutor as laughing and joking around. He and Ms. Cox were also excused because, after being instructed that both direct and circumstantial evidence are acceptable as a means of proof and neither is entitled to any greater weight than the other (CALJIC No. 2.00; 1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 19.3, p. 455), he, nonetheless, felt that direct evidence was just a little better than circumstantial evidence and she vacillated on the issue.[16] There being no requirement that the showing rise to the level of a challenge for cause, we find that the reasons articulated to this point were reasonably relevant to the case, adequately demonstrated specific bias on the part of the Black prospective jurors challenged (*People v. Wheeler, supra,* 22 Cal.3d at pp. 281-282) and appropriately rebutted any inference of discriminatory exclusion.

The striking of Mr. LeFridge, however, causes greater concern. He was excused six days after being examined about his general qualifications. It was not until the following day, when the third Black was challenged, that the first *Wheeler* motion was made. The prosecutor asked if the court wanted

---

objection or contradiction, that there were three Black people on the jury. [Citation to the record.] To maintain that the prosecutor improperly used peremptory challenges to disqualify Black jurors is patently frivolous given the presence of three Black jurors. Further, the prosecutor stated proper, objective reasons for exercising his peremptory challenges against other Black jurors. [Citations to the record.] The challenges were all based upon answers which the jurors gave during voir dire and were objectively sufficient to justify use of the peremptory challenges."

[16]The prosecutor's entire case was predicated on circumstantial evidence.

him to state his reasons for excusing Mr. LeFridge. The court responded, erroneously, that the prosecutor was not obliged to do so because the defendant had not objected to the challenge when made, but added that it would allow the prosecutor to put on the record whatever there was.[17]

Somewhat lulled, then, and without his notes which were apparently at counsel table, he gave as one reason that Mr. LeFridge had been late to court on at least three occasions and he, the prosecutor, did not feel that Mr. LeFridge's attitude was a serious one because the prospective juror was not following the court's instructions to be on time. We have not found, nor has our attention been called to, anything in the record indicating that Mr. LeFridge was ever late at all. We did find, however, that another Black, Mr. McDade, was strongly admonished by the court for being late at least twice much earlier in the proceedings. Mr. McDade's explanation for being late the second time was that he was a single parent, had young children and school had just begun. When the prosecutor was giving his reasons for excusing Mr. LeFridge, the defendant accused the prosecutor of giving "false information," explaining that "it was not Mr. LeFridge who was late" but rather "the other gentleman with the kid problem." Both the prosecutor and the court disagreed but the record would seem to support the defendant.[18]

The second reason given was that Mr. LeFridge did not hold direct and circumstantial evidence with "equal weight." The record does reflect that when the defendant asked Mr. LeFridge, "Isn't it more likely you prefer to take somebody's testimony that say I seen that person do this?" he answered, "Yes." However, after Mr. LeFridge described how he had concluded that certain individuals had stolen his boat, the prosecutor declared, "Now, that's circumstantial evidence." He continued, "Let me ask you this. Do you think that the evidence that you have just described is just as good as direct evidence or not?" Mr. LeFridge answered, "Yes." Had the prosecutor indicated, as he did when he excused others, that Mr. LeFridge had vacillated despite the court's instructions on the issue, given at least twice earlier in the voir dire proceedings, upholding the challenge might have been less difficult. His assertion, however, was more dogmatic and is not supported by the record. We strongly suspect that he was simply not focused. Because the prosecutor was at least somewhat lulled by the court and did not, therefore, consult his notes, we conclude that he made the errors in good faith.

The issue, then, is whether a prima facie showing of discriminatory exclusion is rebutted where the reasons articulated, which adequately demonstrate

---

[17]See footnote 9, *ante.*

[18]Incidentally, the prosecutor's reason for excusing Mr. McDade from the alternate panel (see fn. 12, *ante*) was also appropriate. Although there had been no filing, he had an open case with the district attorney's office concerning child support arrearages.

specific bias, are predicated on mistaken, but good faith, assumptions about that prospective juror's conduct, comments or answers to questions. We conclude that it is. As the *Wheeler* court said, "[C]hallenges ... are to be used to remove jurors who are *believed* to entertain a specific bias...." (Italics added; *People* v. *Wheeler, supra,* 22 Cal.3d at p. 274; see also *People* v. *Turner, supra,* 37 Cal.3d at p. 314.) Although Mr. LeFridge was excused for reasons which the record does not support, it is clear that he was not excused because of his race. The evil addressed in *Wheeler* and its progeny, and now in *Batson,* is the striking of prospective jurors because they belong to a cognizable group and are, therefore, suspected of bias for that reason alone. We hold, therefore, that no prima facie case of exclusion for group bias was ever demonstrated and hold further that the prosecutor appropriately rebutted every reasonable inference thereof.

We do not intimate that "good faith" is the equivalent of "sincere" in this context. In resolving a *Wheeler* motion, a trial court must first determine, and expressly rule on (*People* v. *Turner, supra,* 42 Cal.3d at pp. 728-729 (conc. opn. of Panelli, J.)), whether a prima facie case has been demonstrated. If it has, the court must then, by a sincere and reasoned effort (*id.,* at p. 728), determine whether, for each exclusion, the prosecution has adequately demonstrated specific bias, i.e., " 'a bias relating to the particular case on trial or the parties or witnesses thereto,' " however sincere the prosecution's "judgment" may be that it has. (*People* v. *Trevino, supra,* 39 Cal.3d at pp. 689 and 688, citing *People* v. *Wheeler, supra,* 22 Cal.3d at pp. 276 and 284, fn. 32.) When a prima facie case of discriminatory exclusion is demonstrated and the reasons given in justification, of themselves or in light of what has occurred to that point in the voir dire or occurs thereafter, i.e., in light of all the circumstances (*People* v. *Turner, supra,* 42 Cal.3d at p. 728), do not adequately demonstrate specific bias, the prosecution fails in its burden to show that the challenged prospective jurors belonging to the cognizable group were not excluded for group bias. (*People* v. *Trevino, supra,* 39 Cal.3d at pp. 688-693.) Because the striking of a single prospective juror for group bias is reversible error per se (*People* v. *Wheeler, supra,* 22 Cal.3d at pp. 282-283 and *People* v. *Harvey* (1984) 163 Cal.App.3d 90, 111 [208 Cal.Rptr. 910]), we suggest that where *Wheeler* motions have been made and, of course, each denied, whether the trial court has determined that a prima facie case of discriminatory exclusion has been demonstrated or not, the prosecution, while not compelled to do so (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 284, fn. 32), may be well advised to make a record at some point after the jury selection process has been completed, articulating any reasons or further reasons it may have for having challenged members of the cognizable group, particularly where the selection process is vulnerable to an analysis of disparate treatment. (See *People* v. *Trevino, supra,* 39 Cal.3d at pp. 688-693.) We recognize that to proffer justification when the trial court

has expressly ruled that no prima facie case has been made may be interpreted as a concession of the issue. We believe that to be the lesser evil, however. If the challenges have been made for constitutionally appropriate reasons, there is no harm in articulating those reasons for the record. On the other hand, if no justification is proffered and the trial court errs in its determination that no prima facie case has been made, a reversal will almost certainly follow, the reviewing court having no record upon which to determine whether the challenges were legally justifiable.

## VI

### ACCESS TO LEGAL MATERIALS

Davis contends further that he was denied due process because his access to legal materials was impaired and he was, thus, prevented from preparing a defense.[19] He points out that while he brought the problem to the trial court's attention several times during the trial, the trial court denied his requests for continuances and refused to hold a hearing on the issue. Had the requests been granted or a hearing held and appropriate orders to the sheriff or county jail personnel made, he argues, the resultant access could have precluded the admission of highly prejudicial evidence, e.g., inadmissible hearsay about the defendant's admissions to Aaron Scott, twice presented to the jury by the investigator's nonresponsive answers to the defendant's cross-examination.[20]

In a posttrial review of an alleged error by the trial court in not securing to a defendant adequate access to legal materials, the defendant must demonstrate not only the error but also the consequent prejudice suffered. (*People* v. *Pompa-Ortiz, supra,* 27 Cal.3d at pp. 529-530; *People* v. *Smith* (1985) 38 Cal.3d 945, 952-953 [216 Cal.Rptr. 98, 702 P.2d 180].)

There was no error. The defendant's matter was heard Monday through Thursday, affording him three days each week to use the library, in addition to what was otherwise available.[21] There was a break in the proceedings between August 18 and September 6, 1983. The trial court responded to the problem on several occasions by contacting the legal officer at the jail. It ordered that the defendant be given time in the jail law library

---

[19]Among the dangers and disadvantages of which a defendant seeking pro. per. status ought to be made aware is the possible limitation or suspension of his pro. per. privileges (*Ferrel* v. *Superior Court, supra,* 20 Cal.3d at p. 892, fn. 5), including access to the law library.

[20]We note the prescience of the motion judge who, in warning the defendant of the dangers of self-representation, said, "[I]n conducting a case, hearsay may be admitted against you unless you make a timely objection."

[21]The defendant did comment that on Friday, he had "ex parte," perhaps referring to proceedings under Penal Code section 987.9, of which we have no record.

and that nothing, not even disciplinary problems within the jail, was to interfere with that. During the course of the trial, the deputy sheriff in charge of the facility kept a record and, orally and in writing, advised the court of the hours available to, and used and refused by, the defendant.

Additionally, a privilege is not a right. ▮ Access to a law library, by defendants freely choosing to represent themselves at trial, is not compelled by any constitutional, statutory or common law mandate. While access by such defendants may not arbitrarily be denied, nor, once conferred, terminated or restricted (*Wilson v. Superior Court* (1978) 21 Cal.3d 816, 823-824 [148 Cal.Rptr. 30, 582 P.2d 117]), there is no requirement that such defendants be afforded specific books or access at specific times or on specific days.[22] Subject to writ review for abuse, we leave it in the sound discretion of the trial courts to evaluate the exigencies of the matter at bench and determine what relief, if any, is in the interests of justice. (*People v. Smith, supra*, 38 Cal.3d at p. 952.)

▮ There was also no prejudice. The defendant would have us conclude that had he been given greater access to the jail law library, he would have sought, found, read and understood the relevant materials precluding the admission of the evidence. We know of no authority that compels this court to engage in such flights of speculative fancy. More importantly, Aaron Scott was in the courtroom for some part of the trial and could have been called by the prosecution to testify. Had he testified to something other than what he told the investigator, the investigator could have been called to the stand. The defendant's admissions to Aaron Scott could properly have been adduced thereby and received as substantive evidence of the defendant's guilt. (Evid. Code, §§ 1235 and 1220; 1 Witkin, Cal. Evidence (3d ed. 1986) The Hearsay Rule, § 576, p. 551.) If the evidence came in through the back door, it was not because the front door was closed.[23] Further, the defendant exacerbated the problem. Some loss of library time was due to his being disciplined in the "hole."[24] Further loss occurred when the defendant refused library time, not wanting to awaken at 5:30 a.m. on Saturdays that he might be at the library when it opened at 6 a.m. Even those impediments might have been overcome had he not, in the middle of the trial, voluntarily relinquished the services of his advisory counsel, lauded by the trial court as an excellent research attorney. The court, at least twice

---

[22]See *Bounds* v. *Smith* (1977) 430 U.S. 817 [52 L.Ed.2d 72, 97 S.Ct. 1491], stating a different rule for state prisoners where, unlike here, attorneys are not available to assist or represent them.

[23]The defendant too, of course, could have called Aaron Scott to rebut any lapse of memory or worse by the investigator.

[24]In the defendant's words, a "segregated place." Some loss of pro. per. privileges as a disciplinary measure has been sanctioned by the California Supreme Court, albeit, with limitations. (See *Wilson* v. *Superior Court, supra*, 21 Cal.3d at p. 824, fn. 7.)

thereafter, urged the defendant to call on his, now standby, counsel for research purposes. The defendant insisted on his "right to represent . . . [himself] without aid or assistance."[25] Under the circumstances, the defendant can hardly be heard to complain.

## VII

### LACK OF SLEEP

■■■ The defendant contends, as well, that he was denied due process because he was compelled to proceed with the voir dire of the jury panel when, having been deprived of sufficient sleep, he was too tired to meaningfully participate. On the morning of August 16, 1983, during the voir dire of prospective jurors about their qualifications to sit on a capital case (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]; *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301]), the defendant complained that he had gotten back to the county jail the previous night at 10 p.m., sat in his cell "with a headache" after the lights were turned off, which he guessed was about "11:00, 11:30," before going to sleep, and been awakened at 4:30 a.m. The trial court concluded that the defendant had gotten at least six hours of sleep and was competent, at that moment, to proceed.

In his sporadic argument on the motion to continue, covering some 25 pages of transcript of which about 7 reflect the questioning of one juror, the defendant was heard and observed by the trial judge who found the defendant as capable to proceed with the selection of the jury as he had been the day and the week before. The court observed the defendant to be energetic and capable of talking "for another half hour" if allowed to do so. The court commented, "I have observed Mr. Davis, and I don't believe that he is unnecessarily fatigued, and certainly not too fatigued to ask questions, to listen, to know what's going on, and to participate."

Although he peevishly refused to question prospective jurors that morning, when he did address the problems of the day, he appeared quite lucid. For example, early in the afternoon session, a prospective juror asked to be excused for hardship, explaining that he was the sole calculus teacher at a community college, school was about to start and he could not be replaced. He had earlier indicated that he could not vote for the death penalty unless the murder was the result of torture. The defendant, nonetheless, stipulated that the prospective juror be excused because "I wouldn't

---

[25]One of the reasons that the defendant sought cocounsel, in the first place, was to do research.

want to put him in a position where his mind would be somewhere else and not here in the courtroom. That is very important and I think that would be a problem." Minds may differ about tactical priorities but the reasoning was cogent.

There was substantial evidence to support the finding of the trial court that the defendant was competent to proceed. There was no abuse of discretion in denying his motion to continue the matter.[26]

VIII

DENIAL OF THE HITCH MOTION

 The defendant contends that the trial court erred in denying his motion to exclude testimony about a latent fingerprint lifted from a knife found at the crime scene. There was no blood on that knife when it was found and the decedent had not been stabbed or cut with one. It was, therefore, not taken into custody and it disappeared, the prosecutor representing to the court that it had been disposed of by the decedent's executor. The defendant argued that the knife was material because it could have helped him to prove that the print either had not been taken from the knife or, had been transferred to the knife from some object touched by the defendant somewhere other than at the crime scene.

The contention is without merit. The knife was photographed and the tape material used to lift the print reflected the imprint of a knife. Further, the print was lifted almost immediately after the murder and months before the defendant was arrested. More importantly, his fingerprint expert was in court at the time of the motion and, presumably, ready to testify, but the defendant proffered no evidence in support of his arguments. He explained that there were two witnesses then unavailable and he did not want to proceed with "half a *Hitch* motion." (*People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361].) The trial court denied the motion without prejudice.

Our attention has not been called to, nor have we found, anything in the record indicating that any evidence was ever presented in support of the motion. It is the defendant's threshold burden to demonstrate some materi-

---

[26]We note that during the noon recess of some two-and-one-half hours, the defendant slept forty minutes and "took two tylenol." It was only thereafter that Ms. Volk was questioned. She was the only prospective juror examined that day who later became a part of the jury that delivered the verdicts. On September 28, 1983, she was examined about her general qualifications, passed for cause and sworn in as an alternate. Had the defendant been concerned about his competency on August 16, 1983, he could then have exercised one of his peremptory challenges. He had an ample number, having used none on the alternate panel.

ality, i.e., some showing that there is a reasonable possibility that the missing (or destroyed) item would constitute evidence favorable to him on the issue of guilt or innocence. (*People* v. *Hitch, supra,* 12 Cal.3d at p. 649.) While the defendant argued vigorously for much of two days, argument is not evidence and the trial court did not err in denying the motion.[27]

## IX

### REVOCATION OF PRO. PER. STATUS

 Finally, Davis contends that the trial court erred in revoking his pro. per. status. The trial court did not. The defendant made vituperative statements and prefaced his "questions" with inflammatory editorial comments throughout the trial. He quite improperly disparaged the court, the prosecutor and the evidence. He was repeatedly warned.

Late in the afternoon on the final trial day of that particular week, he started one question with, "The district attorney notify the deputies to keep me here so he could get down there first, that's why they take me to a room and leave me there until 12:30 . . . ." It was stricken. Shortly thereafter, referring to an exhibit, he asked, "And there is everything else written in blue and this is written in black, do you understand why?" When the witness answered that he did not, the defendant stated, "That is something the district attorney does these days." It was stricken. A little later, the defendant was using some exhibits in his examination and the court ordered that they be marked. The prosecutor began to describe them for the record, precipitating these remarks from the defendant, "Does the district attorney mind? He is intruding on my examination. Is he just going to mark them? Would the district [attorney sit] down and close his face? Is he going, going to do any preaching now?" The court struck the remarks but the defendant persisted. "I asked if the district attorney is going to do any preaching?" The court ignored it and asked, "What is the next . . . [exhibit]?" The prosecutor started to identify it and the defendant objected with, "If the district attorney is going to do all of this, I wonder if he should just stand up and get on the witness stand?" That was stricken. Only a short while later, the court asked, "What are we talking about? This is 136? Is this 137?" The defendant answered, "We are talking about something that the district attorney made, People's 135 [the same exhibit to which the defendant earlier referred in commenting that that was 'something the district attorney does these days']." The following colloquy ensued: "MR. LONGO: Objection to that statement that it was made by the district attorney.

---

[27]We do not imply that a defendant who meets this threshold burden is entitled to sanctions. (*California* v. *Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528]; *People* v. *Tierce* (1985) 165 Cal.App.3d 256, 261-265 [211 Cal.Rptr. 325].)

"THE DEFENDANT: That is what we are talking about.

"THE COURT: Mr. Davis, again, a warning.

"THE DEFENDANT: Yes, Your Honor.

"THE COURT: Any further statements of that nature—any further statements whatsoever other than questions will result in your being removed as your own counsel.

"THE DEFENDANT: Your Honor, these are threats. You make your own decision.

"MR LONGO: Objection to [his] speaking to the court—

"THE COURT: All right. Excuse me.

"Mr. Davis, you are now represented by your standby counsel."

"[T]he trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct. . . . The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law." (*Faretta* v. *California, supra,* 422 U.S. at pp. 834-835, fn. 46 [45 L.Ed.2d at p. 581].) In the opinion of the trial court, the trial had "become close to a farce in the way he [the defendant] was conducting himself on cross-examination and direct examination. And had he been permitted to continue, . . . the jury would have been distracted from the evidence, possibly to the prejudice of the defendant."

In articulating its reasons for denying the defense attorney's request that the defendant's pro. per. status be reinstated, the trial court said it well: "The law gives him the right to represent himself, of course, and I believe that he was properly found competent to waive counsel. But I believe, also, that he has deliberately misused his pro. per. status thus far.

"He should not be permitted to disparage opposing counsel and the court, and to disrupt the orderly presentation of the trial.

"The system of justice, after all, is deserving of some respect and is being degraded by the conduct of the trial as it has been going. And I don't believe that the court should reinstate his pro. per. status.

"It's difficult to conduct argument at the bench because it's conducted by the defendant in a loud voice. And he continues to make statements which are improper statements concerning the court's impartiality and concerning the evidence and opposing counsel.

"And it's the court's inherent right to conduct a fair trial. And I don't believe that we're going to accomplish it if the defendant is allowed to proceed as his own counsel.

"The court warned him repeatedly. The court believes that he well knew what he was doing each time he made an outburst or disruption."

The defendant complains that the revocation occurred quite late in the trial, he having just concluded the examination of his second witness, and his standby counsel, who had not been privy to the defendant's plans for his own defense, was not afforded sufficient time to prepare. If there was a problem, it was of the defendant's own doing. (*People* v. *Brownlee* (1977) 74 Cal.App.3d 921, 930-933 [141 Cal.Rptr. 685].) We note, however, that counsel was present from the middle of the voir dire, his advisory services were voluntarily relinquished, and it was six days after his appointment that the next witness was called. We further note that the defendant refused to speak to his attorney on any subject relating to the trial until he, the defendant, indicated that he wished to testify in his own defense. The record does not indicate when that was, but, if the presentation of the defense suffered, the defendant is substantially to blame. It may be prudent henceforth, however, to advise a defendant seeking pro. per. status, that, if the status is granted and later revoked or relinquished, the new defense counsel may well be at a disadvantage to the defendant's detriment.[28]

He further complains that his conduct on that day was no more serious or prejudicial than it had been on previous days, intimating a kind of equitable estoppel. We are not persuaded. A trial court is not estopped from revoking pro. per. status merely because it has formerly displayed the skin of a rhinoceros and the patience of Job. ▮ It is vested with vast discretion in determining when and where to draw the line. The exercise of that discretion will not be disturbed in the absence of a strong showing of clear abuse.

Judgment affirmed.

Thompson, Acting P. J., concurred.

---

[28]We do not suggest that failure to do so will, of itself, be grounds for a mistrial, a new trial or the reversal of a judgment.

JOHNSON, J, Concurring and Dissenting.—I concur in the judgment in all respects and in the disposition of all issues in this appeal, save one. That issue is "whether a prima facie showing of discriminatory exclusion is rebutted where the reasons articulated, which adequately demonstrate specific bias, are predicated on mistaken, but good faith, assumptions about that prospective juror's conduct, comments or answers to questions." (Majority opn. p. 1177 *ante.*) The majority opinion answers this in the affirmative. I respectfully disagree. However, I also am convinced appellant failed to establish a prima facie showing of discriminatory exclusion. Consequently, I still support affirmance of the conviction.

In seeking to probe the prosecutor's motives for exercising peremptory challenges the courts are embarked on a difficult enough enterprise. The trial court must determine the prosecutor's state of mind at the time he or she decided to challenge a given juror. Did the prosecutor exclude a juror because the juror was of a minority race or did he do so because of other, legitimate reasons? The appellate court, in turn, must review the prosecutor's explanation and the trial court's ruling on this question from a cold, hard record. We should not compound our problem by having to speculate about the prosecutor's state of mind at the time he or she was justifying an earlier state of mind.

When the record reflects a prosecutor gave a clearly erroneous justification it is seldom possible for us to ascertain from that record—that is, from the words the prosecutor used—whether he or she erred in good faith or not. Only in the most extreme and unusual case will there be enough in the record to allow an appellate court to fix a bad faith label on a prosecutor. In essence, to do so means calling a particular prosecutor a deliberate liar. Yet consider what happens if we automatically assume, as the majority opinion appears to do, that the prosecutor acted in good faith. We essentially sanction any explanation no matter how careless the prosecutor may be with the truth or how unbiased and otherwise qualified the excluded minority juror or jurors may have been.

This is not to say convictions should be reversed every time a prosecutor makes a mistake in explaining why he or she challenged a given juror. But here there is nothing substantial remaining *in the explanation itself* which would support a contention this prosecutor challenged this juror for permissible, nondiscriminatory reasons. If the defense had established a prima facie case of discriminatory motive I would hold this erroneous explanation insufficient to justify the peremptory challenge of this juror. I would remand for a posttrial hearing at which the prosecutor was given the opportunity to demonstrate through accurate information about the actual juror involved that he had nondiscriminatory reasons for excusing that juror. If the prose-

cutor failed to do so, the conviction would be vacated and the case remanded for retrial before a jury untainted by a constitutionally infirm pattern of jury selection.

This procedure rather than a rule excusing "good faith error" is the one best calculated to insure prosecutors "consult their notes" and are thorough in reconstructing their own motives and thought processes. Care instead of carelessness on the part of prosecutors, in turn, should give trial judges a sounder basis for deciding these motions. Thus, this approach rather than the position urged in the majority opinion seems best calculated to advance the policies promoted by *Wheeler* and its progeny.

In the instant case, however, the prosecutor's faulty explanation does not become relevant. The evidence independent of the explanation about this particular juror showed this prosecutor was not striking minority jurors for racially motivated reasons. The prima facie case of discriminatory exclusion was lacking. Consequently, I support the judgment of affirmance despite my reservations about the "good faith error" rule announced by my colleagues.

Appellant's petition for review by the Supreme Court was denied June 18, 1987. Mosk, J., was of the opinion that the petition should be granted.