[No. F006346. Fifth Dist. Aug. 3, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT RAY CAMPO, a Minor, Defendant and Appellant.

[Opinion certified for partial publication.*]

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I, II and IV.

1424

COUNSEL

## COUNSEL

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, and Sandra Gillies, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, and W. Scott Thorpe, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**BALLANTYNE, J.—**

### INTRODUCTION

An information was filed against defendant, Robert Ray Campo, charging him with the murder (Pen. Code, § 187) and kidnap (Pen. Code, § 207, subd. (a)) of Ashraf Bandari, known as Germaine to his friends. It was also alleged that defendant used a firearm within the meaning of Penal Code section 12022.5 during the commission of the offenses. Because defendant was 17 years old at the time of the offenses, a fitness hearing was held in juvenile court where defendant was found unfit for a juvenile proceeding. He was ordered to be tried as an adult.

On February 4, 1985, defendant entered a conditional plea of guilty to the charges. The condition was that he be referred to the California Youth Authority (hereinafter CYA) for the preparation of an amenability report. If the report prepared by CYA was unfavorable, he would be allowed to withdraw his guilty plea. The court stated that if the report was favorable, it would follow its recommendation.

The report from CYA was unfavorable to the defendant. Defendant subpoenaed the employees of CYA who participated in the preparation of the report. The Attorney General filed a motion to quash the subpoenas. The court held a hearing and granted the motion to quash the subpoenas. Defendant was allowed to withdraw his plea.

The jury convicted defendant as charged. At his sentencing hearing defense counsel waived the preparation of a new amenability report by CYA. The court used the original report. The court denied counsel's request that defendant be committed to the Youth Authority. Defendant was sentenced to prison for two years for the gun use and a consecutive sentence of twenty-five years to life for the murder. The sentence for the kidnapping was stayed as was the additional gun use enhancement. The court ordered that for the defendant's protection he be housed at CYA pursuant to Welfare and Institutions Code section 1731.5.

## FACTS

Michael Wilson and Russell Goodin were friends and lived with Goodin's sister, Julia Francis. Germaine was Francis's boyfriend and he stayed at her house on occasion.

Francis was on probation for a drug conviction. She was told that Germaine was going to "snitch" on her because she was using drugs. He was also going to "snitch" on Michael Wilson and Goodin for some burglaries.

On September 3, 1984, Francis, Michael Wilson and Goodin were at Francis's house. Germaine was also there. Francis said something had to be done about Germaine.

Francis got ready for work. Michael Wilson drove her to work at about 10 p.m. Michael Wilson returned to the house and joined Goodin and Germaine. Germaine said he was leaving to return to his home in Kuwait on Wednesday. Michael Wilson and Goodin decided to keep him at Francis's house until that time. They tied him up.

They later untied Germaine and the three went looking for Michael Wilson's sister, Jennifer Wilson. They found Jennifer Wilson at a friend's house. Jennifer Wilson, Lori Harkins (hereinafter Harkins), and defendant got into the car with Michael Wilson, Goodin and Germaine. They returned to Francis's house. They all sat around and drank beer. Francis returned from work about midnight.

At some point during the evening Michael Wilson and Harkins went to Harkins's house to get some handcuffs. Also, Francis, Harkins and Jennifer Wilson went to the store and purchased some plastic trash bags. During this trip, Francis told Harkins and Jennifer Wilson that Germaine was going to "snitch" on her, Michael Wilson and Goodin. She said that something had to be done about it.

During the evening Germaine was handcuffed and placed in the bedroom where he was stripped and Harkins beat him on the face with her fists. Later Germaine dressed back into his clothes.

During the evening Francis had a discussion with Jennifer Wilson, Harkins, Michael Wilson and Goodin and told them that Germaine should be killed. They decided that the defendant should be the triggerman because he was the youngest and would not get into as much trouble. The defendant joined the group and Harkins told him that he had been chosen to be the

triggerman. The group continued to drink and also snorted "crank" (methamphetamines).

As the sun rose, everyone except Francis got in Francis's car. The shotgun and a hoe were loaded into the trunk. Germaine was handcuffed in the back seat and Goodin drove to the Shaver Lake area.

When they arrived, they walked a substantial distance from the road where Jennifer Wilson and Harkins began digging with the hoe and a jack stand. Germaine remained seated on a rock, smoking a cigarette, watching as his grave was dug. Michael Wilson helped dig the grave. During this time, defendant fired a shot past Germaine's head to scare him.

Defendant told Germaine to lie on his back in the grave. Germaine said he wanted to lie on his stomach. Jennifer Wilson put a garbage bag over Germaine's head and feet. Defendant shot Germaine in the back of the head. Harkins, Jennifer Wilson and Michael Wilson covered up the body with dirt. Defendant and Michael Wilson used branches to cover up their tracks.

Several days after the killing defendant told David Overstreet that he had killed someone. He told Overstreet that he did it because of peer pressure. He claimed that the others called him names and he finally decided to do it. Jennifer Wilson, Michael Wilson and Harkins denied that they called defendant names. John Sanchez testified that defendant told him he shot someone. Defendant told Sanchez that the others did not want to do it so he did it.

Jennifer Wilson and Harkins were allowed to plead guilty to voluntary manslaughter. Michael Wilson was allowed to plead guilty to second degree murder. In exchange for their pleas they were required to testify truthfully at the trial of the other defendants.

DISCUSSION

I., II.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

---

*See footnote page 1423, *ante.*

## III.

### Did the Court Err When It Quashed the Subpoenas for CYA Personnel Who Prepared the Amenability Report?

The defendant entered a guilty plea to first degree murder before Judge Olmos. The plea was entered on the condition that defendant would be sentenced to CYA. The court stated that if the report from CYA regarding amenability was favorable, it would be inclined to commit the defendant to CYA. Defendant entered his plea and was sent to CYA for the preparation of an amenability report pursuant to Welfare and Institutions Code section 707.2.

The report was prepared and defendant was returned to the court for sentencing. The report concluded that defendant would not be amenable to treatment at the Youth Authority. Although the report was essentially a favorable one, the conclusion was unfavorable. The defendant requested an opportunity to present additional evidence and in particular to subpoena the personnel from the Youth Authority who participated in the preparation of the report. The trial court stated: "There's still some question in my mind raised from a review of the amenability determination report. I believe the fact there's inconsistencies Mr. Cenci [defense counsel] has raised were ones that also crossed my mind as I read the report and considered that, along with the other information filed before the Court. And prior to making a finding on that issue, I think it would be appropriate to grant the request, to have a hearing, to have the personnel from the Department of the California Youth Authority present to give their testimony, plus hearing any additional witnesses prior to making a ruling on that."

The Attorney General's office filed a motion to quash the subpoenas. Citing *People* v. *Arbuckle* (1978) 22 Cal.3d 749, 753-756 [150 Cal.Rptr. 778, 587 P.2d 220, 3 A.L.R.4th 1171], the Attorney General asserted that "[g]enerally, there is no right to subpoena personnel who prepare diagnostic reports merely because a party to a lawsuit does not like the diagnostic report."

Defense counsel, in opposition, responded that *Arbuckle* was not applicable because a report prepared for adult sentencing and a report prepared to determine amenability to CYA are different. Defense counsel contended that the Youth Authority is not as large as the Department of Corrections, and therefore the burden would not be as great especially in light of their differing philosphies. Defense counsel finally argued that fundamental fairness required that the testimony of the Youth Authority personnel be taken.

The court below stated: "All those factors are set forth at page 755 of the Arbuckle opinion. In addition, the Court there indicated that the legislative intent could have easily have established such procedure. But it's very difficult, I think, under the circumstances, to—to make a distinction between the Department of Corrections and the California Youth Authority given the rationale of the Arbuckle case. The same reasons appear to apply to the present case.

*"For that reason, the Court has no choice but to [grant] the Attorney General's motion to quash the subpoenas for the four witnesses subpoenaed."* (Italics added.)

Defendant withdrew his plea and proceeded to trial before Judge Ardaiz. At his sentencing hearing the court inquired whether defense counsel wanted-ed a new amenability report prepared. Defense counsel declined the offer and agreed to submit the matter to the court based on the previously prepared report. The court considered the report and denied defendant's request to be committed to CYA.

In *People* v. *Arbuckle, supra,* 22 Cal.3d 749, the defendant was referred to the Department of Corrections for a diagnostic report pursuant to Penal Code section 1203.03. The Department of Corrections, in its report, concluded that the defendant should receive a prison term. The correctional counselor expressed a minority viewpoint recommending probation with jail time. (*Id.* at p. 752.) Defendant sought to subpoena the personnel who prepared the report. The subpoenas were quashed. Defendant appealed. (*Id.* at p. 753.)

The *Arbuckle* court held that in-court testimony is required only in those instances where a fundamentally fair hearing cannot be had without it. (*Id.* at pp. 755-756.) "Reliability of the information considered by the court is the key issue in determining fundamental fairness." (*Id.* at pp. 754-755.) The court held that fundamental fairness did not require that the personnel who prepared the report be subpoenaed. The report prepared by the Department of Corrections was inherently reliable "because it was made pursuant to a court order by expert, objective government personnel in pursuit of their official duties." (*Id.* at p. 755.) Furthermore, the report did not stand in isolation; it was supported by the probation officer's report and by the statutory presumption against probation for the offense committed by the defendant.

The *Arbuckle* court further stated: "The defendant could have challenged factual statements contained in the report by presenting his own evidence; but fundamental fairness does not require that he be allowed to challenge such statements by cross-examining the personnel who prepared the report,

nor does it require that he be permitted to challenge the professional methods they employed. The report was fair on its face; a full hearing on collateral issues emanating in an ever-widening circle from the central issue—the proper sentence to be imposed—is therefore not warranted." (*Ibid.*)

The Supreme Court was concerned about the drain on time and public resources if a defendant could at will subpoena all the personnel who participated in his evaluation.

"Absent a contrary legislative command, it should be within the sound discretion of the trial court to determine those instances when in-court testimony is required to provide a fundamentally fair proceeding." (*Id.* at pp. 755-756.)

In *People* v. *Smith* (1985) 38 Cal.3d 945, 960-961 [216 Cal.Rptr. 98, 702 P.2d 180]: "Defendant, at his sentencing, requested that the court call as a witness the probation officer who prepared the probation report. Defendant has no right to cross-examine such a witness for the reasons stated in *People* v. *Arbuckle* (1978) 22 Cal.3d 749 . . . . The reasoning behind *Arbuckle* was that, although a defendant is not precluded from presenting any affirmative evidence of his own, neither the Sixth Amendment nor the Penal Code requires that he be permitted to cross-examine the person who, pursuant to statutory mandate, prepares a probation report."

■ Defendant asserts that the ruling quashing the subpoenas is erroneous in two respects. First, defendant argues that *Arbuckle* does not apply to the instant case. Defendant asserts that the philosphies and purposes of the juvenile system and adult system are radically different and that because of this the juvenile report must be subject to critical scrutiny. Critical scrutiny is not applicable in adult sentencing where the focus is on punishment. Furthermore, defendant contends that *Arbuckle* should not control because the CYA report is given great weight. The diagnostic report in *Arbuckle* was only one of many factors for the trial court to consider.

■ Second, defendant argues that even if *Arbuckle* controls the court failed to exercise its discretion to determine if fundamental fairness required that CYA personnel be subpoenaed. Assuming that the court did exercise its discretion, defendant asserts that it was an abuse of discretion to quash the subpoenas.

Respondent responds that the court's comments, when viewed in a reasonable manner, show that it exercised its discretion. It was familiar with *Arbuckle* and it must be presumed that it properly followed the established law. Respondent further contends that *Arbuckle* is applicable to the instant

case. The rationale of *Arbuckle* applies equally to amenability reports regardless of the systems' differing philosphies. We agree.

In *People* v. *Marling* (1981) 116 Cal.App.3d 284 [172 Cal.Rptr. 109], the defendant was the first person convicted of first degree murder to be referred to CYA for a diagnostic study. The report concluded that he was amenable to CYA programming.

"Because contrary conclusions were contained in the probation report and reports from two psychiatrists, and the court's familiarity with the case gained during Marling's trial, the court expressed doubt as to the validity of the diagnostic conclusion.

"Recognizing it was not bound to follow the CYA recommendation, (*People* v. *Carl B*. (1979) 24 Cal.3d 212, 218-219 . . .), but wishing to give Marling every opportunity to show why its conclusion should be followed, the court had all CYA personnel who participated in preparing the report appear at sentencing for an examination lasting two and one-half days.

"The court alternatively ruled Marling ineligible for commitment to CYA because he had been convicted of first degree murder and, after reviewing all the evidence, determined a prison commitment was appropriate." (*Id.* at p. 286.)

The defendant appealed asserting that the trial court had abused its discretion when it ordered a prison commitment. The *Marling* court held: "The trial court was not required to hold any hearing in which CYA personnel would have the right to appear for examination to support the recommendation. As Marling correctly points out, he would not have been able to initiate such a proceeding over the Attorney General's objection. (*People* v. *Arbuckle* (1978) 22 Cal.3d 749, 755 . . . .) However, he shows no prejudice from the court doing so and we detect none. He fully participated in examining CYA personnel. If Marling wished to expand the list of witnesses and was prevented from doing so we would have no hesitation in finding this to be error, but he made no such request.

"Marling accurately describes the court as being most skeptical of the soundness of the diagnostic study recommendation, the methodology of its preparation and the reliability of information on which it was based. However, contrary to Marling's assertion, the court's decision not to commit him to CYA was based on substantial evidence neither he nor society would materially benefit from such a commitment. Before sentencing the court reviewed the evidence in light of sentencing objectives contained in California Rules of Court, rule 410. There was no abuse of discretion." (*Id.* at p. 287.)

■ Although the philosphies of the juvenile and adult systems are very different—rehabilitation versus punishment—the rationale underlying the decision in *Arbuckle* applies equally to both. The diagnostic report in *Arbuckle* was inherently reliable because it was prepared by expert, objective government personnel in pursuit of their official duties. The personnel who prepare amenability reports for the Youth Authority are also expert, objective government personnel in pursuit of their official duties.

· The drain on time and public resources to require the testimony of Youth Authority personnel is significant. This is true even though the Department of Corrections is in charge of seven times the number of inmates as the Youth Authority.[2] The Youth Authority supervises approximately 8,500 inmates. (*Roland Named to Head Corrections Department,* The Fresno Bee (May 20, 1987) p. A14, cols. 1-4.) Every person who is a juvenile at the time he committed an offense must be referred to CYA for the preparation of an amenability report. The report is prepared by a team of experts. The pressure on the system would be tremendous if a juvenile offender could, at will, subpoena all the personnel who participated in the evaluation. The rationale supporting the *Arbuckle* decision has equal application to cases involving the Youth Authority.

The *Arbuckle* rationale and holding apply equally to the instant case. Under *Arbuckle* the court retains discretion to determine if in-court testimony is required to provide a fundamentally fair proceeding.

■ The court in the instant case noted the factors set forth in *Arbuckle* and found the rationale to apply to CYA reports. The court stated, "[f]or that reason, the court has no choice but to [grant] the Attorney General's motion to quash the subpoenas for the four witnesses subpoenaed."

The court clearly relied upon the *Arbuckle* decision, pointing particularly to page 755. The *Arbuckle* decision was not new law. It was decided seven years prior to the hearing in the instant case. ■ "It is presumed that official duty has been regularly performed" (Evid. Code, § 664), and in the absence of contrary evidence this court must assume that the trial court properly followed established law. (*Ross* v. *Superior Court* (1977) 19 Cal.3d 899, 913 [141 Cal.Rptr 133, 569 P.2d 727].) ■ Since the *Arbuckle* decision was the crucial case to control the issue before the court, it is

---

[2] Of course, some of the inmates under the jurisdiction of the Department of Corrections were initially referred to CYA for the mandatory preparation of an amenability report and were later sentenced to prison. Thus, although constituting a portion of the adult prison population, they were originally referred to CYA. CYA had to prepare a report on them. Also, *the figure is somewhat misleading because CYA houses inmates only until age 25.* The length of the sentence of many inmates in prison is much longer, and therefore the overall prison population is much larger.

reasonable to assume that the court read all applicable portions of the case, including page 756 which set forth the discretionary language. The court's statement that it "had no choice" but to quash the subpoenas may reasonably be interpreted to mean that it considered the report to be fair on its face because it was prepared by expert government employees and there was no showing that the factual basis relied on by the experts was incorrect or unreliable. The fact that the experts came to different conclusions based on reliable and *unchallenged* factual bases did not by itself rise to a showing of a lack of fundamental fairness. Without such a showing the court had "no choice" but to quash the subpoenas.

The court exercised its discretion and did so properly. Defendant did not challenge below nor does he challenge on appeal any of the information utilized in the report. As in *Arbuckle,* the makers of the report came to differing conclusions based on fair information before them.   **(1c)**  Inconsistent findings and results by expert objective government personnel are not sufficient to permit a defendant to challenge the professional methods employed when the report is fair on its face. There was no error.

### IV.

#### DID THE TRIAL COURT ABUSE ITS DISCRETION IN FINDING DEFENDANT NOT AMENABLE TO CYA COMMITMENT? *

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

#### DECISION

The judgment is affirmed.

Hamlin, Acting P. J., and Reid, J.,† concurred.

A petition for a rehearing was denied September 2, 1987, and appellant's petition for review by the Supreme Court was denied November 12, 1987.

---

* See footnote, page 1423, *ante.*
† Assigned by the Chairperson of the Judicial Council.